Filed 4/5/18 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGELO ANDREW ARREDONDO et al.,<br><br>    Defendants and Appellants. | D072632<br><br>(Super. Ct. No. RIF1205278)<br><br>ORDER DENYING REHEARING<br>AND MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 19, 2018, be modified as follows:

1.  On page 9, footnote 2 is deleted and a new footnote inserted as follows:

    2    Arredondo's sentence was composed of a life sentence without the possibility of parole on the murder conviction plus 25 years for the firearm enhancement as provided under section 12022.53, subdivision (d), and 10 years for two prior serious felony convictions, pursuant to section 667, subdivision (a). The trial court stayed sentencing on the section 12022.53, subdivision (e) enhancement.  Ramirez's sentence was composed of life without the possibility of parole on the murder conviction plus 10 years for the gang finding under section 186.22, subdivision (b).

2. On page 17, first full paragraph, the third sentence starting with "With respect . . . ." should be deleted and a new sentence inserted as follows:

"With respect to the defendants' murder convictions and Arredondo's section 12022.53, subdivision (d) enhancement true finding, we are convinced the prosecutor's statements were harmless."

3. On page 22, first full paragraph, the first sentence is deleted and a new sentence inserted as follows:

"Arredondo argues the judgment again him should be reversed in its entirety because the impact of cumulative errors deprived him of due process of law."

4. On page 4, the word "statues" is deleted and replaced with the word "statutes."

There is no change in the judgment.

Respondent's petition for rehearing is denied.

BENKE, Acting P. J.

Copies to: All parties

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANGELO ANDREW ARREDONDO et al.,<br><br>    Defendants and Appellants. | D072632<br><br><br>(Super. Ct. No. RIF1205278) |

APPEALS from judgments of the Superior Court of Riverside County, David A. Gunn, Judge.  Affirmed in part; reversed in part.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant Angelo Andrew Arredondo.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant Michael Ramirez.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

The jury convicted both defendants in this case of first degree murder and found the special circumstances that the murder was committed during the course of a robbery and during the course of a kidnapping. The jury found that one of the defendants, Angelo Andrew Arredondo, had used a firearm in committing the murder. The jury found both defendants committed the murder for the benefit of a criminal street gang.

As we explain more fully below, on this direct appeal we are not in a position to find that Arredondo's counsel was ineffective in conceding that his client was guilty of felony murder, but that the jury should nonetheless reject the robbery special circumstance allegation. In theory, an attorney may reasonably concede the impact of overwhelming evidence in an effort to establish his or her own credibility and use that credibility as a means of diminishing the scope of his or her client's responsibility. By way of collateral proceedings, in which the attorney has an opportunity to fully defend his choice, this issue can be definitively resolved.

We nonetheless reverse in part the defendants' convictions. In his opening argument to the jury as well as in his rebuttal to defense arguments, the prosecutor repeatedly referred to the defendants and other gang members as "cockroaches" and repeatedly suggested to the jury they were part of a larger hidden threat to the safety of the community. As we explain more fully below, the vice in the prosecutor's argument is not simply his use of a colorful epithet to describe the defendants. The evidence presented by the prosecutor showed that the defendants were leaders of a larger group of people who: cruelly and callously lured the victim to a garage, beat him, put him in the trunk of his own car, stripped the car of the victim's belongings and then drove the victim

2

to a field, where, as he tried to escape, they chased him down, shot him in the back and, worried he might survive, slit his throat. The cases are clear prosecutors may express, in the most vivid and even emotional terms, their disgust with the conduct of defendants shown by the evidence. However, prosecutors may not suggest to the jury that a guilty verdict is required because of the need to punish a group with whom the defendants are associated or because of some uncharged and unspecified crimes the defendants or others may have committed. Here, the prosecutor's relentless description of the defendants and the other participants in the crime as "cockroaches" who together with others pose a hidden threat to the community, plainly suggested in powerful terms just such guilt by association and responsibility for uncharged acts.

Because of the overwhelming evidence, the defendants planned to rob the victim and then decided to kill him, and that in doing so they kidnapped him, the prosecutor's misconduct does not require that we reverse their murder convictions or the jury's special circumstances findings. However, we must reverse the jury's gang findings. The evidence that the robbery, kidnapping, and murder were committed to benefit or otherwise advance the interests of a criminal street gang was somewhat conflicting and the prosecutor's repeated reference to guilt by association was directly related to those gang allegations.

We also reverse the firearms enhancement imposed on Arredondo so that on remand the trial court may exercise the discretion recently provided to trial courts under the current version of section 12022.53, subdivision (h).

3

FACTUAL AND PROCEDURAL BACKGROUND

1. *Renteria's Death*

Fernando Renteria was a small-time drug user and distributor in the Moreno Valley area of Riverside county. He also had an intermittent and stormy romantic relationship with one of his customers, Elizabeth Garcia.

Late on the evening of August 8, 2012, Garcia and a friend, Fallon Flores decided that they would lure Renteria to Garcia's house and rob him of drugs and money. They invited Arredondo, who was a member of the West Side Rivas criminal street gang and a drug dealer, to Garcia's house. Arredondo had been selling drugs in the same part of the Moreno Valley claimed by Renteria and someone had shot at Arredondo in apparent retaliation for Arredondo's incursion into Renteria's turf. Arredondo felt disrespected and saw an opportunity to resolve the turf dispute.

Early in the morning of August 9, 2012, Garcia and Arredondo called Renteria and Arredondo told Renteria that Garcia was now his girlfriend and, at Garcia's urging, talked "smack" to Renteria. Renteria was upset and went to Garcia's house. Before Renteria arrived, Arredondo called one member of another gang, the Edgemont Locos, who in turn called two other Edgemont Locos members and they arrived at Garcia's house to support Arredondo. Ramirez was one of the three Edgemont Locos members who came to help Arredondo, along with Michael O'Malley and Angel Rosales. Arredondo also called Jonathan Oporta, who was a member of a third gang, but had recently begun associating or "hanging out" with Arredondo.

4

Initially, Renteria sat down and began talking with Arredondo and the others. Renteria offered the others some of the drugs he brought with him and while they were sharing the drugs, Arredondo struck Renteria and the others joined in beating him. At knife point, Renteria's hands and legs were bound with speaker wire, the car he was driving was backed into the garage of Garcia's house and Renteria was placed in the trunk of the car. While Renteria was in the trunk, the others ransacked his car and took speakers and other items from it, including the "pink slip" to a motorcycle he owned, which they compelled him to sign.

Eventually, Arredondo, Ramirez, Oporta, and O'Malley drove Renteria's car with Renteria in the trunk toward a field, where they planned to shoot him. Before heading to the field with Renteria in the trunk, they made stops to get gas and a shotgun; Oporta's girlfriend, Reyna Mosqueda, assisted them by driving some of the group in her car.

As they were approaching the field, Renteria managed to get out of the trunk and attempted to flee in his stocking feet. Oporta was in the front passenger side of the car holding the shotgun; however, Oporta testified he did not want to be part of a murder. Oporta got out of the car and pointed the shotgun at Renteria, but pretended it had jammed. Arredondo then got out of the car, took the gun from Oporta, chased Renteria and shot him in the back; however, Renteria was still breathing and Arredondo could not find a second shell for the shotgun. Because Arredondo was worried Renteria might survive, Ramirez, who had a knife, got out of the car, went over to Renteria and slit his throat. When Renteria was found he had knife wounds in his neck in addition to a slashed throat.

5

Arredondo and the others spent most of the rest of August 9 arranging for the sale of the car Renteria had been driving. The following day, August 10, Renteria's friend and sometime roommate, Martin Guevara, went to Garcia's house looking for him. Guevara had been with Renteria before Renteria went to Garcia's house and knew that had been Renteria's destination the previous morning. Guevara noticed items that had been taken from the car Renteria had been driving in Garcia's garage; while talking to Garcia and Arredondo, Arredondo told Guevara he could get Renteria's car back, but probably not Renteria. Based on what he saw and heard, Guevara deduced Renteria was dead.

Guevara called his girlfriend and told her what he saw and heard and what he believed had happened to Renteria. Guevara's girlfriend in turn contacted Renteria's girlfriend, who was in jail. Renteria's girlfriend told jail officials what she learned; in a very short period of time law enforcement personnel found Renteria's body and searched Garcia's house, where they found a good deal of incriminating physical evidence.

2. *Jailhouse*

Very shortly after the murder, almost all the participants in Renteria's murder were arrested: Arredondo, O'Malley, Rosales, Oporta, Mosqueda, Garcia, and Flores. When Arredondo was arrested he was wearing Renteria's shoes. Arredondo agreed to speak to investigators and admitted being at Garcia's house, knowing about the plan to rob Renteria and participating in the beating; Arredondo also admitted driving the car to the field where he was killed. According to Arredondo's statement to investigators, Oporta shot and then stabbed Renteria.

6

However, contrary to what Arredondo told investigators, Arredondo told his cellmate that he took the shotgun from Oporta, shot Renteria and Ramirez then slit Renteria's throat because Renteria was still breathing. According to his cellmate, Anthony Arriola, Arredondo also asked Arriola to help kill Oporta, who was housed in the same jail.

Approximately one month after the initial arrests, Ramirez was apprehended and overheard in telephone conversations making incriminating statements.

3. *Trial*

At trial, the prosecution's principle witness was Oporta, who had plea guilty to a single count of murder in exchange for a determinate sentence of 25 years. His testimony was corroborated by other participants, by Arriola, and by physical evidence found at the scene of the murder and at Garcia's house. Two gang experts also testified with respect to the gang allegations. They identified Arredondo as a member of the West Side Rivas and Ramirez, Rosales and O'Malley as members of the Edgemont Locos. Although Oporta had been identified as a member of a third gang, the Independent Riders, he testified that at the time of the murder he was no longer a member of any gang. One of the gang experts also testified that two of the participants, Rosales and O'Malley, who had pled guilty, admitted gang allegations charged in their cases. In response to hypothetical questions based on the facts similar to Renteria's murder, they stated that the hypothetical crime was for the benefit of a gang. However, the experts did not know of any previous or ongoing cooperation between the West Side Rivas and the Edgemont Locos.

7

As we noted, during his closing argument, Arredondo's counsel conceded that Arredondo was guilty of murder, but that the jury should reject the robbery special circumstance allegation because his primary goal was to kill Renteria, not rob him; he also argued that there was not sufficient evidence of movement to support the kidnapping special circumstance. As we also noted at the outset, and elaborate more fully below, in his opening and closing arguments to the jury, the prosecutor repeatedly referred to defendants as cockroaches and warned the jury about what "these people" were doing in the middle of the night, while the law-abiding citizens of Morena Valley were asleep in their homes.

The jury found both defendants guilty of murder in the first degree and found true both the robbery and kidnapping special circumstances. With respect to Arredondo, the jury found true the related enhancements set forth in sections 12022.53, subdivision (d) and 12022.53, subdivision (e)[1]; the jury found Ramirez was not responsible for the

---

[1] Sections 12022.53, subdivisions (d) and (e) state:
"(d) Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."
"(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:
(A) The person violated subdivision (b) of Section 186.22.
(B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d).

8

firearm use under section 12022.53, subdivision (e).  As to both defendants, the jury

found the murder was committed for the benefit of a criminal street gang within the

meaning of section 186.22, subdivision (b).  As we indicated, the trial court found

Arredondo had suffered two prior prison terms.  Arredondo was sentenced to life without

the possibility of parole plus 35 years to life; Ramirez was sentenced to life without

possibility of parole, plus 10 years.[2]

DISCUSSION

I.

Arredondo's Appeal

A.  *Incompetence of Counsel*

In beginning his closing argument to the jury, Arredondo's attorney stated:  "Is Mr.

Arredondo guilty of murder?  I would have to say he is.  And as your jaws drop, I hope

you are not going to stop listening to me, because I tell you this. The law is fairly clear on

---

[2] (2) An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

[2] Arredondo's sentence was composed of a life sentence without the possibility of parole on the murder conviction plus 25 years for the firearm enhancement as provided under section 12022.53, subdivision (d), and 10 years for the gang finding under section 186.22, subdivision (b).  The trial court stayed sentencing on the section 12022.53, subdivision (e) enhancement.  Ramirez's sentence was composed of life without the possibility of parole on the murder conviction plus 10 years for the gang finding under section 186.22, subdivision (b).

9

the felony murder rule that he was involved in a robbery and/or a kidnapping and a death involved, and certainly he is guilty of first-degree murder.

"Is he guilty of the special circumstance robbery murder, and then I'd say no without any hesitation and we will talk about that.

"Mr. Arredondo's intent and the evidence has been very clear from the get go that unfortunately he was going to kill Mr. Renteria, more than likely at the urging of Lisa or Fallon Flores. That is what his intent was, and that is fairly evident from Oporta's testimony. Right away what happened to Mr. Renteria, it was pretty clear from the outset. And you will be told and we will go over this a little bit more in the end, if the robbery is incidental to the murder, the murder is the primary reason that the robbery is incidental, then it is not a robbery murder special circumstance, so that special circumstance should be found not true by you.

"And I know you have a hard time saying, well, if he was conceding he was going to kill him, that is what his intent was from the get go. You don't manufacture a bootstrap robbery murder special circumstance because someone dies. If that is what his intent was all along to kill the person, and the fact he took his shoes or the things with the pink slip to the motorcycle, all of that was incidental to the primary intent which was to kill, and that is what his intent was, then he is guilty of first-degree murder and nothing more, and not that is not significant, but in terms of the special circumstance I don't think that special circumstance is proven.

10

"Did he commit kidnapping? Well, maybe [the prosecutor] gave you an argument about substantial distance. Was the harm increased, and that is something you would make up for yourselves. Because, again, the instruction on kidnapping, if the murder was the primary cause, you have to decide did the kidnapping or the asportation element increase the potential risk of harm, either psychological or physical, decrease his ability to escape, things of that sort.

"The incident aspect of the kidnapping special circumstance is a little bit different than the robbery. The law says that if in fact the kidnapping is incidental to the person's primary intent, which I am telling you was to kill, the law says that you can find the special circumstance kidnapping to be true. So, if you determine that he was guilty of a kidnapping, then the special circumstance would probably fall into place." Counsel devoted the remainder of his argument to an attack on Oporta's credibility in an attempt to convince the jury that Oporta, rather than Arredondo and Ramirez both shot Renteria and slit his throat.

On appeal, Arredondo contends this concession amounted to ineffective assistance of counsel. Counsel's approach was certainly unusual and arguably damaged Arredondo's case. Indeed, the appellate record reveals a substantial problem with counsel's choice: there really was no dispute Renteria was kidnapped and taken a sufficient distance to support the kidnapping special circumstance, which could be found even if Arredondo's primary intent was to kill Renteria. Those circumstances certainly call into question whether counsel's concession that Arredondo intended to kill Renteria

11

would provide Arredondo with any advantage which was at all commensurate with the negative impact counsel's concession no doubt had on the jury.

On the other hand, as the People point out, such an effort to establish counsel's credibility when the record at trial is itself undeniably damaging to a client, is not unprecedented and has been approved where, as here, there is overwhelming evidence of a client's guilt to some of the charges or some of the theories asserted by the prosecution. (See *People v. Lucas* (1995) 12 Cal.4th 415, 446–447. Arguably, counsel's concession may have been an effort to establish credibility so that he could assert that in fact Oporta was the shooter and at least plant the seed in the jury's mind that Arredondo should not be treated any differently than the principal witness against him.[3]

---

[3] We note however that *Lucas* is arguably distinguishable from our case because Arredondo raised a factual defense that Oporta was the shooter; hence, the record here may not be "undeniably damaging" to Arredondo. Moreover, *Lucas* was a capital case. There, counsel was arguably attempting to establish credibility going into the penalty phase.

In any event where, as here and as is typical, the appellate record has not provided counsel the opportunity to offer an explanation for his or her tactical choice, we affirm without prejudice to the defendant's right to litigate his claim in collateral proceedings in which counsel has the opportunity to offer an explanation for his or her tactical choice. (See *People v. Delgado* (2017) 2 Cal.5th 544, 559; *People v. Pope* (1979) 23 Cal.3d 412, 425.)[4]

B.  *Prosecutorial Misconduct*

As we indicated at the outset, during his argument the prosecutor repeatedly made reference to the defendants as "cockroaches."  We found 11 such references in both his opening argument and in his rebuttal.[5]  After the second reference to the defendants as

---

[4]    In capital cases, such as *Lucas*, where counsel is attempting to spare his client the death penalty, the risk and benefit calculus is sui generis and may require that counsel take greater risks in order to avoid a verdict of death.  Where a client faces a sentence of life without possibility of parole, similar deference to counsel's choices may, in particular cases, be appropriate.  However, that question is better resolved in collateral proceedings in which there is a fuller record with respect to the actual reasons counsel made challenged tactical choices.

[5]    The offending statements were as follows:
1.  "You have seen what happens in Moreno Valley while the good citizens of Moreno Valley are in their beds at nighttime.
      "While those people are asleep in their beds, these *cockroaches* are out there running around committing crimes and victimizing the people of Riverside County and Moreno Valley."(Italics added.)
2.  "And so when you have crimes like this, and when you have these crimes happening in the middle of the morning, 2:00, 3 o'clock in the morning, in order to shine the light on what *these cockroaches* do in our community." (Italics added.)
3.  "In order to shine a light on *these cockroaches* to see what they are doing, sometimes it is necessary to use people with first-hand information.  People who were there and people who saw what happened." (Italics added.)

13

cockroaches, counsel objected and his objection was overruled.  The prosecutor then made nine more cockroach references, several couched in terms of the need to protect the community from the criminality of the "cockroaches."

As the People point out, a prosecutor's use of colorful and powerful epithets is not on its own misconduct.  "We have observed that a prosecutor is not 'required to discuss

---

4.  "When Renteria was moved from that garage floor and into the trunk of a car and bound, at that point that is movement that increases the physical or psychological harm to Mr. Renteria.
"Psychological harm at that point, that poor man, the thoughts going through his head must have been unbearable.  Unbearable to be beaten, to have a knife to your throat, to be kicked to whaled upon by *these cockroaches* was unbearable." (Italics added.)

5.  "Each of these people, cockroaches swarming around the floor of that garage in Tyann Court, each taking some little piece of property that doesn't belong to them.  Each of them helping each other with their gang mentality, each of them being backed up by their homeboys so they can victimize somebody else in our society."

6.  "So, again, society, the legislature, we the people have determined that if you kill and you're the actual killer, we hold you responsible, but if you're not the actual killer, but you're part of *these group of cockroaches* who commit these crimes, then we will hold you responsible if it seems that you're indifferent to the life of a human being." (Italics added.)

7.  "While the rest of the good citizens of Moreno Valley were asleep in their beds, preparing to go to work the next day, *these cockroaches* are out there doing these crimes." (Italics added.)

8.  "[Oporta] has put his life in jeopardy because when you testify against *these cockroaches*, you yourself are then the focus of attack, and you could be killed because you have agreed to testify." (Italics added.)

9.  "The evidence, all of the video evidence that you saw corroborates Oporta...you saw all the stills showing the movements of *these cockroaches* in the early morning of the hours on August the 9th." (Italics added.)

10.  "[Ramirez] had knowledge that they stripped that car because he was in that car himself trying to steal the property, finding whatever he could.... like *a bunch of cockroaches* scurrying around in that garage."  (Italics added.)

11.  "You are putting him more at risk and you are minimizing his ability to escape from *these cockroaches*." (Italics added.)

14

his [or her] view of the case in clinical or detached detail.' [Citations.] 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation.] We have repeatedly rejected claims of prosecutorial misconduct involving the use of such epithets in guilt phase arguments. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1195, [no misconduct where prosecutor characterized crimes as ' "serial killing," ' and ' "terrorizing and killing" ' people] (italics omitted); *People v. Jones* (1998) 17 Cal.4th 279, 308–309 [no ineffective assistance of counsel for failure to object to prosecutor's characterization of defendant's crime as a "terrorist attack" and comparison of defendant to '[t]errorists']; *People v. Pensinger, supra*, 52 Cal.3d 1210, 1250–1251, [no misconduct where prosecutor referred to defendant as a ' "perverted maniac" '].) Here, as in those cases, we conclude that these epithets, *which were but fleeting characterizations in the course of the prosecutor's very lengthy summations*, did not constitute misconduct." (*People v. Tully* (2012) 54 Cal.4th 952, 1021 (italics added).)

Here, the problem with the prosecutor's use of the cockroach epithet presents is not that it plainly denigrated and dehumanized the defendants based on their cruel, callous and vicious treatment of Renteria. In light of *Tully* and the evidence presented here, a fleeting characterization of Arredondo and Ramirez as cockroaches would not rise to the level of misconduct. However, here the use of the epithet was hardly fleeting—the record shows it was relentless; it began in the very first words uttered by prosecutor to the jury and continued throughout both his opening argument and rebuttal. The vice here is

15

that the epithet became, by virtue of both its repetition and its power, *the major theme* of the prosecutor's argument.  That theme was highly improper.

The clear message conveyed by the prosecutor's repeated reference to the defendants and apparently the other participants as cockroaches is that this group of individuals is not entitled to any individual consideration or justice, but must be viewed as a disgusting group which poses an ongoing threat to the entire community.  There is no place in our system of justice for the notion of guilt by association or guilt for the acts of others.  (*People v. Galloway* (1979) 100 Cal.App.3d 551, 563; *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1071–1072.)  "Guilt by association is a thoroughly discredited doctrine; personal guilt, on the other hand, a fundamental principle of American jurisprudence, inhabiting a central place in the concept of due process." (*People v. Chambers* (1964) 231 Cal.App.2d 23, 28; see also *Uphaus v. Wyman*, 360 U.S. 72, 79; *Bridges v. Wixon*, 326 U.S. 135, 163, conc. opn.)

The prosecutor's argument here, which we must say is quite unusual and in no sense represents the professionalism and competence of the overwhelming number of prosecutors, whose tireless and often thankless work we see day in and day out in the records before us, compels us to reiterate the unique principles which govern the conduct of prosecutors:  " 'As the representative of the government a public prosecutor is not only obligated to fight earnestly and vigorously to convict the guilty, but also to uphold the orderly administration of justice as a servant and representative of the law. Hence, a prosecutor's duty is more comprehensive than a simple obligation to press for conviction. As the court said in *Berger v. United States* (1935) 295 U.S. 78, 88: "[The Prosecutor] is

16

the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." [Citations.]' " (*People v. Daggett* (1990) 225 Cal.App.3d 751, 759.)

Having found error in the prosecutor's argument which had the impact of denying both defendants their right to due process, we determine its prejudicial impact under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.) With respect to the defendants' murder convictions and Arredondo's 12022.53, subdivision (c) enhancement true finding, we are convinced the prosecutor's statements were harmless. Beyond Arredondo's counsel's concession that his client was guilty of felony murder, the record supporting the murder convictions here is uncontested: in addition to the witnesses and physical evidence which place both defendants at the scene of Renteria's death, we have Arredondo's statements to police and to Arriola. Under either version Arredondo provided, both defendants are guilty of felony murder.

17

Much the same is true with respect to the special circumstances found by the jury. There is no dispute in the record that the participants planned initially to rob Renteria as a means of exacting revenge, that they in fact did rob him of the contents of the car he was driving as well as the car itself, and that in putting him in the trunk of his car and driving him to get gas, a shotgun, and to the field where he was killed, he was kidnapped.

The jury's findings that the murder was committed "for the benefit of, at the direction of, or in association with any criminal street gang" within the meaning of section 186.22, subdivision (b), are however more problematic because evidence to support these enhancements was less compelling. As the defendants point out, Oporta, when asked at trial, stated that he was not gang member; Arredondo was a member of the West Side Rivas, Ramirez, Rosales, and O'Malley were members of Edgemont Locos and the gang experts conceded they were not aware of any past or ongoing cooperation among the gangs. We also note that Garcia's motive appeared to be based on her personal relationship with Renteria and Arredondo's participation appeared to grow out of competition in the drug trade. On the other hand, the collective guilt which the prosecutor improperly advocated in his argument, had an obvious and direct bearing on the jury's consideration of the gang allegations. In this regard we note, not every crime committed by members of a gang is for the benefit of a gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) Thus, we cannot say the prosecutor's repeated reference to collective guilt had no impact on the jury's agreement the murder was for the benefit of a gang.

18

Accordingly, we must reverse the true finding with respect to section 186.22, subdivision (b) and section 12202.53 subdivision (e) and remand for retrial of those allegations.[6]

C. *Senate Bill No. 620 (SB 620)*

As we noted, with respect to Arredondo, the jury found true alleged firearm enhancements under section 12202.53, subdivisions (d) and (e). In addition to sentencing Arredondo to life without possibility of parole on his murder with special circumstances conviction, the trial court imposed an additional sentence of 25 years to life under section 12202.53, subdivision (d) and stayed imposition of the section 12202.53, subdivision (e) enhancement. At the time of sentencing, the trial court had no power to strike either firearm enhancement under section 1385. (See former § 12022.53, subd. (h).) However, in 2017, while Arredondo's appeal has been pending, the Legislature approved and the governor signed SB 620, which, as of January 1, 2018, gave trial courts the discretion to strike section 12022.53 firearm enhancements. (§ 12022.53, subd. (h).)

Arredondo asks that he be given the benefit of the current version of section 12022.53, subdivision (h), and that we remand so that the trial court may exercise the discretion now provided by the statute. The Attorney General has conceded that Arredondo is entitled to the benefit of the current version of section 12202.53, subdivision (h). We accept the Attorney General's concession. Retrospective application of a new penal statute is an exception to the general rule set forth in section 3, which bars retroactive application of new penal code statutes unless the legislature has

---

6    In light of our disposition of the gang allegations, we need not reach the defendant's additional arguments attacking the jury's true findings.

expressly provided for such application. (*People v. Brown* (2012) 54 Cal.4th 314, 324–325 (*Brown*).) However, a statute which lessens the penalty for a crime gives rise to an inference the Legislature intended the change to apply to all nonfinal cases. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308, fn. 5 (*Lara*); *In re Estrada* (1965) 63 Cal.2d 740, 745 (*Estrada*).) Provisions which give trial courts discretion to reduce a sentence previously required by the Penal Code are nonetheless changes which benefit offenders who committed particular offenses or engaged in particular conduct and thereby manifest an intent by the Legislature that such offenders be given the benefit of that discretion in all cases which are not yet final. (*People v. Francis* (1969) 71 Cal.2d 66, 76.) "[T]here is such an inference because the Legislature has determined that the former penalty provisions may have been too severe in some cases and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances." (*Ibid.*) In sum then, the very discretion now provided by section 12022.53, subdivision (h), creates an inference the Legislature intended that in all cases not yet final, offenders subject to the firearm enhancement set forth in section 12022.53 be given the benefit of that discretion. (*Ibid.*)

In addition to the discretion which the Legislature provided trial courts, we also note that section 12022.53, subdivision (h) states that "[t]he authority provided by this subdivision applies to any resentencing that may occur *pursuant to any other law*." (Italics added.) By its express terms, this provision extends the benefits of SB 620 to defendants who have exhausted their rights to appeal and for whom a judgment of conviction has been entered but who have obtained collateral relief by way of a state or

federal habeas proceeding.  We interpret this extension of SB 620 as an expression by the Legislature of its understanding that it would also be applied to all cases which were not final at the time it became effective.  It is difficult to perceive a rationale for giving relief to a defendant whose judgment might be several years old but who was a successful habeas litigant and provide no relief to a defendant whose conviction was entered in a trial court as recently as December 29, 2017.

In sum, the Legislature, in enacting SB 620 has made it clear it intended and expected that its provisions would be applied to all cases pending at the time it became effective and thus it is outside the general rule set forth in section 3.  (See *Brown, supra*, 54 Cal.4th at p. 325.)   Accordingly, on remand the trial court must determine whether either or both the section 12202.53, subdivision (d) and subdivision (e) enhancements found by the jury should be stricken under the current version of section 12022.53, subdivision (h).

## II.

## Ramirez's Appeal

In addition to the issues raised by Arredondo, Ramirez contends the trial court erred in admitting Arriola's testimony recapitulating what Arredondo told him while they were in jail together.  He argues the statement was hearsay and that it did not fall within the exception for statements against penal interest.  (Evid. Code, § 1230.)  We disagree.

As we noted, Arredondo confessed to Arriola that he shot Renteria and Ramirez then slit Renteria's throat.  The statement, although it clearly implicated Ramirez as well as Arredondo, was a statement someone in Arredondo's position would not have made

21

" 'unless he believed it to be true.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 716; accord *People v. Smith* (2017) 12 Cal.App.5th 766, 789.) Thus, it was admissible under Evidence Code section 1230. (*People v. Grimes,* at 716; *People v. Smith,* at p. 789.)

## III.

Both Arredondo and Ramirez argue the judgments against them should be reversed in their entirety because the impact of cumulative errors deprived them of due process of law. (See *People v. Hill* (1998) 17 Cal.4th 800, 844–848.) On appeal, we have only found prosecutorial misconduct and have found that the conduct only requires reversal of the jury's gang related findings. Thus, on appeal we are in no position to find cumulative error. However, as indicated, our unwillingness to find ineffective assistance of counsel on appeal, is without prejudice to Arredondo's right to establish it by way of collateral proceedings. In this regard, if Arredondo is successful in establishing his claim of ineffective assistance of counsel, he may wish to assert in those collateral proceedings that the combination of prosecutorial misconduct and counsel's concession, if found to be unreasonable, effectively deprived him of a fair trial. (*Ibid.*)[7]

## DISPOSITION

The jury's findings that the murder was committed for the benefit of or in association with a criminal street gang within the meaning of sections 186.22, subdivision (b) and section 12022.53, subdivision (e) are reversed and remanded for further proceedings. The trial court's imposition of a firearm enhancement under section

---

[7] We express no opinion with respect to whether Ramirez may also pursue such a claim in collateral proceedings.

12022.53, subdivision (d) is reversed and remanded and the trial court is directed to exercise its discretion under section 12022.53, subdivision (h) with respect to that enhancement as well as any enhancement found on remand under section 12022.53, subdivision (e).   In all other respects, the judgments of conviction are affirmed.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


AARON, J.

23

BENKE, J., concurring.

I concur in both this panel's opinion and the result we have reached. I nonetheless write separately to set forth my views with respect to retrospective application of Penal Code[1] section 12022.53, subdivision (h), and, in particular, my strongly held opinion that, guided by the Supreme Court in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308, footnote 5 (*Lara*), we should abstain from any further reliance on a presumption of retroactivity when the legislature adopts a measure which lessens or potentially lessens the punishment for a crime.

Relying on *In re Estrada* (1965) 63 Cal.2d 740, 747–748 (*Estrada*) and *People v. Brown* (2012) 54 Cal.4th 314, 324 (*Brown*), at least two recent cases have concluded that in all nonfinal cases, in the absence of evidence to the contrary, courts must *presume* the Legislature intends a statutory amendment reducing criminal punishment apply retroactively.[2] There is no such presumption, either in the Penal Code or in the governing law provided to us by the Supreme Court. Indeed, with respect to penal statutes, even those reducing the punishment for certain crimes, our analysis must begin with the contrary presumption. Section 3 clearly states, "No part of (the Penal Code) is retroactive, unless expressly so declared." The presumption of prospective application is not unique to the Penal Code. It appears in identical language in section 3 of the Civil Code and section 3 of the Code of Civil Procedure. "[T]he language of section 3 erects a

---

[1] All further statutory references are to the Penal Code.

[2] (See *People v. Robbins* (2018) 19 Cal.App.5th 660; *People v. Woods* (2018) 19 Cal.App.5th 1080.)

strong presumption of prospective operation, codifying the principle that, 'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application.' [Citations.] Accordingly, ' "a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective." ' " (*Brown, supra*, 54 Cal.4th at p. 324.)[3]

Neither section 12022.53 nor subdivision (h) contain language expressly stating the statute is to be applied retroactively. Therefore, in the absence of evidence to the contrary, the presumption to be applied is that section 12022.53, subdivision (h) is

---

[3]     The court in *Brown* recognized that language in *Estrada*, if literally or broadly applied, was inconsistent with the principles embodied in section 3. (*Brown, supra*, 54 Cal.4th at pp. 324–325.) Accordingly, in *Brown,* the court expressly limited the scope of *Estrada*: "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown,* at p. 324.) In *Brown*, the court went on to hold that a temporary increase in good conduct credits an inmate could earn under former section 4019 was not outside the mandate of section 3 and therefore would not be applied retrospectively. (*Brown*, at p. 325.) The credits were not mitigation of the punishment for a particular criminal offense, and thus, did not on their face suggest the Legislature intended that they apply to all nonfinal judgments. (*Ibid*; see also *In re Pedro T.* (1994) 8 Cal.4th 1041, 1045 ["[o]rdinarily when an amendment lessens the punishment for a crime, one may reasonably *infer* the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest." (Italics added.)]; accord *People v. Nasalga* (1996) 12 Cal.4th 784, 792.)

2

prospective. We may overcome this presumption only by examination of the Legislature's intent in enacting the new statute.[4]

The California Supreme Court recently addressed the application of *Estrada.* As the court explains in *Lara,* "We have occasionally referred to *Estrada* as reflecting a 'presumption.' (E.g., *Conley, supra,* 63 Cal.4th at p. 656; [*Brown, supra,*] 54 Cal.4th . . . at p. 324.) We meant this to convey that ordinarily it is reasonable *to infer* for purposes of statutory construction the Legislature intended a reduction in punishment to apply retroactively." (*Lara, supra*, 4 Cal.5th at p. 308, fn. 5.)[5]

The language of footnote 5 in *Lara* is significant and merits our careful consideration. "A *presumption* is an assumption of a fact that the law *requires* to be made from another fact or group of facts found or otherwise established in an action. A

---

4    The Supreme Court has been at some pains to emphasize for us that the question of whether a statute is to be given retrospective application is a matter of legislative intent. (See *In re Pedro T., supra*, 8 Cal.4th at pp. 1046–1047; *People v. Nasalga, supra*, 12 Cal.4th at pp. 793–794; *People v. Conley* (2016) 63 Cal.4th 646, 657–659; *Brown, supra*, 54 Cal.4th at p. 324 and *Lara, supra*, 4 Cal.5th at p. 308.) Indeed, in *Estrada* itself, the court emphasized: "The problem," we explained, "is one of trying to ascertain the legislative intent—did the Legislature intend the old or new statute to apply?" (*Estrada, supra*, 63 Cal.2d at p. 744.)

5    Indeed, quite recently in *People v. DeHoyos* (Mar. 12, 2018, S228230) __Cal.5th__ [2018 LEXIS 1496] (*DeHoyos*), such an occasion once again arose and the Supreme Court once again made reference to an "*Estrada* presumption," but nonetheless found no general retroactive application of the reduction of theft and drug crimes to misdemeanors as provided in Proposition 47 adopted by voters in 2014 because of the *inference* to be drawn from a procedure set forth in the proposition by which those serving felony sentences could have their convictions reduced by the trial court which imposed the sentence. (*DeHoyos, supra*, __Cal.5th at __.) I interpret these references in *DeHoyos* to a "presumption" to mean, as the court in *Lara* stated, the reasonable inference which arises when ameliorative penal statutes are enacted.

3

presumption is not evidence." (Evid. Code, § 600, subd. (a), italics added.) In contrast, an *inference* is only a "deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in an action." (*Id*., subd. (b); see also *Morton v. Manhattan Lunch Co*. (1940) 41 Cal.App.2d 70, 72 [an inference is a form of indirect evidence].) Thus, the court's terminology marks an important clarification in the way *Estrada* is to be applied, and avoids any conflict with section 3. Because, in light of *Lara*, it is now clear *Estrada* simply recognized a permissible *evidentiary inference, Lara* expressly limits the reach of *Estrada*; it does not, expand it. (See Evid. Code, § 600.)

As our majority opinion points out, provisions which give trial courts discretion to reduce a sentence previously required by the Penal Code are changes which benefit offenders who committed particular offenses or engaged in particular conduct and, as in *Estrada,* manifest an intent by the Legislature that such offenders be given the benefit of that discretion in all cases which are not yet final. (*People v. Francis* (1969) 71 Cal.2d 66, 76.) "[T]here is such an inference because the Legislature has determined that the former penalty provisions may have been too severe in some cases and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances." (*Ibid*.)

When, as here, a criminal defendant argues he or she is entitled to the benefit of new legislation, we must begin with the *contrary* presumption, expressly set forth in section 3, that unless there is express language to the contrary, statues are prospective only. If there is any ambiguity in the new enactment with respect to retroactivity we then

4

resolve that ambiguity by resort to familiar rules of statutory history and construction, including the *inference* found by the court in *Estrada, supra*, 63 Cal.2d at p. 745. (See also *Brown, supra*, 54 Cal.4th at pp. 324–325.) As our majority opinion points out, the very discretion now provided by section 12022.53, subdivision (h), creates an inference the Legislature intended that in cases not yet final, offenders subject to the firearm enhancement set forth in section 12022.53 be given the benefit of that discretion. (*People v. Francis, supra*, 71 Cal.2d at p. 76.) That inference is of course bolstered by that portion of section 12022.53, subdivision (h), which now provides that "[t]he authority provided by this subdivision applies to any resentencing that may occur *pursuant to any other law*." (Italics added.)

In sum, it is not necessary or legally sound to employ a presumption that is at odds with section 3. The Legislature, in enacting Senate Bill No. 620 has made it clear it intended and expected that its provisions would be applied to all cases pending at the time it became effective, and thus, it is outside the general rule set forth in section 3. (See *Brown, supra*, 54 Cal.4th at p. 325.)

BENKE, Acting P. J.

5