Filed 11/1/18; Opinion following rehearing

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD GARCIA,<br><br>    Defendant and Appellant. | E068490<br><br>(Super.Ct.No. FVI1501152)<br><br>O P I N I O N |

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Affirmed with directions.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Arlene A. Sevidal, Randall Einhorn, and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Following a jury trial, defendant and appellant, Richard Garcia, was convicted of first degree residential burglary. (Pen. Code, § 459.)[1] Defendant admitted having one prior strike/prior serious felony conviction and one prison prior, and he was sentenced to 14 years in prison, including a five-year consecutive term based on his prior serious felony conviction. (§ 667, subd. (a) (hereafter § 667(a)).)[2] In this appeal, defendant claims the court abused its discretion and deprived him of his due process right to present a defense by excluding the expert testimony of Dr. Robert Shomer concerning the reliability of eyewitness identifications. We find no merits to these claims. But we remand the matter for resentencing pursuant to Senate Bill No. 1393 (2017-2018 Reg. Sess.) (S.B. 1393). S.B. 1393 amends sections 667(a) and 1385, subdivision (b) (hereafter § 1385(b)), effective January 1, 2019, to give courts discretion to dismiss or strike a prior serious felony conviction for sentencing purposes. In all other respects, we affirm the judgment.

# II. FACTS AND PROCEDURAL HISTORY

## A. *Prosecution Evidence*

Around 10:30 a.m. on April 25, 2014, Richard Knowles, who lived in Barstow, was returning home from a walk when he observed a large black vehicle parked on the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant's 14-year sentence consists of the middle term of four years for the burglary, doubled to eight years based on the prior strike conviction, plus five years for the prior serious felony conviction, plus one year for the prison prior.

street between his driveway and the driveway of his next-door neighbor, Sherisa Clark. The vehicle was facing the wrong direction. Knowles also observed a young Hispanic woman in the driver's seat of the vehicle and a White male in the back seat behind her. A second White male came through Knowles's side gate and got into the back passenger seat.

Knowles also observed a Hispanic man walk through Clark's side gate, down her driveway, and get into the front passenger seat of the vehicle. The vehicle then drove away. Later on April 25, Detective Keith Libby showed Knowles a six-pack photographic lineup containing a photograph of defendant in the first position. Knowles told the detective that the first photograph "looked like one of the guys" he saw coming from Clark's home, but at trial, in October 2015, Knowles and Detective Libby both testified that Knowles was "hesitant, uncertain" about his identification of defendant as the Hispanic male. Knowles told the detective he did not look very well at the Hispanic male's face.

At trial in October 2015, Knowles recalled that the Hispanic male was wearing a "hoodie" and a red plaid flannel shirt, and was "a little bit buffed up" so Knowles did not want to "mess with him." Knowles testified he "got a look" at the Hispanic male, but the "detail" was "lost" to him because he was not wearing his glasses and the incident occurred quickly. Thus, at trial, Knowles did not "positive[ly]" identify defendant as the Hispanic male. But Knowles was able to read the vehicle's license plate number and called 911 shortly after the vehicle drove away. Department of Motor Vehicle records

3

showed the vehicle was a Chevrolet Blazer, registered to defendant, and defendant lived in Victorville. On April 25, 2014, officers did not find defendant at his Victorville address.

The police found signs of forced entry into Clark's home, including pry marks on a side door leading into the garage and pry marks on the interior garage door leading into the home. A blue crowbar which could have made the pry marks and which did not belong to Clark was found inside the home. Latent fingerprints were taken from inside the home, but all of the fingerprints that were suitable for comparison matched Clark's fingerprints; none of them matched defendant's fingerprints.

Clark's bedroom had been "completely ransacked" and the rest of her home had been "somewhat ransacked." A watch, approximately $200 in cash, jewelry, and medical marijuana were missing. No one had permission to be in Clark's home or take her property. Clark did not know defendant. As Clark was leaving her home before the burglary on April 25, she noticed a large vehicle she had never seen before, parked on her street several houses away from hers and facing the wrong direction.

Clark returned home shortly after the burglary, accompanied by her friend, Daniella Watkins. Outside Clark's home, Knowles told Watkins that one of the suspects he saw was a White male with a "purple thing on his cheek." Watkins told Detective Libby that the description sounded like Joshua Kemp, who was "like [her] brother-in-law." Watkins also testified she had grown up with defendant, who was known as Richie, and that defendant and Kemp were "good friends." Before trial, defendant's

4

friend Cassy contacted Watkins and asked whether Watkins would be coming to court, which made Watkins feel "[t]hreatened."

A records check on Kemp revealed he had a purple face tattoo and was wearing a global positioning system ankle monitor at the time of the burglary as a term of his "county parole" or Post-Release Community Supervision. Global positioning system records placed Kemp near Clark's home at the time of the burglary and showed that Kemp traveled from Clark's home to defendant's home in Victorville after the time of the burglary. In April 2015, around one year after the burglary, Knowles identified Kemp from a six-pack photographic lineup as the White man he saw leaving Knowles's property. In identifying Kemp, Knowles was "again uncertain" and "hesitant" about his identification, and was "confused between three of the [six] photos."

Defendant was arrested in August 2014 and later made several phone calls from jail. During one jail call with an unidentified female, defendant said: "I'm really nervous, I'm just hoping they don't have no fingerprints, if they don't then I'm going to fight that shit."

Defendant also made several jail calls to his father. He told his father that "Josh was pretty much busted. They got him there with a monitor . . . ." Defendant also mentioned that Clark's house had been processed for fingerprints, so he did not "want to keep waiving time" and "wait for fuckin something like that to come up." He said Cassie was willing to write a statement for him, and asked his father to ask Kemp's cousin,

Rickie, to contact Kemp so that Kemp could make a statement saying he "had nothing to fuckin do with it."

In another jail call, defendant asked his father to "[r]ing Victoria's mom . . . and try to set up a witness, saying you know, that I was there at the house the whole time when that shit happened." Defendant's father told defendant that Kemp's aunt, Kelly, would testify that defendant was at "[Kelly's house] the whole day . . . and she didn't see, she didn't hear [defendant's] truck leave."

B. *Defense Evidence*

In August 2015, Kemp pled guilty to the burglary in this case. At trial, Kemp testified he took defendant's Chevrolet Blazer while defendant was asleep at Kelly's house, and that defendant "had nothing to do with" the burglary and was not with Kemp during the burglary. Kemp said he used a blue crowbar to break into the victim's home. Shortly after the burglary, Kemp stopped by defendant's house because he was running out of gas and knew defendant had gas in his work trailer. Kemp told a defense investigator he acted alone in committing the burglary, but at trial Kemp said he did not remember whether another person was with him. Kemp had several prior felony convictions.

III.  DISCUSSION

Defendant claims the trial court abused its discretion and violated his due process right to present a defense in refusing to allow Dr. Shomer to testify as a defense expert on eyewitness identifications. He claims Dr. Shomer's testimony was necessary to inform

6

the jury of several factors bearing on the reliability of Knowles's pretrial identification of him as the Hispanic male Knowles saw leaving Clark's property following the burglary. We find no merit to these claims.

A. *Relevant Background*

Around one week before trial, the defense informed the prosecution that it would be proffering the testimony of Dr. Robert Shomer, an expert on the psychological factors affecting the reliability of eyewitness identifications. The prosecution later filed a motion to exclude the testimony, arguing, among other things, that it should be excluded because Knowles's identification of defendant was "substantially corroborated by evidence giving it independent reliability." (*People v. McDonald* (1984) 37 Cal.3d 351, 377 (*McDonald*).)

The court deferred ruling on the motion until after Knowles and other witnesses had testified and ultimately excluded Dr. Shomer's testimony on the ground it would be unduly time-consuming and not "at all" helpful to the jury in evaluating the reliability of Knowles's eyewitness identification of defendant. The court pointed out that Dr. Shomer could not explain anything relevant about eyewitness identifications that a jury could not understand; the case was based on circumstantial evidence and Knowles's identification was not the "reasonable basis" of establishing defendant's guilt; that Knowles was "far from certain" of his identification; and any expert testimony concerning six-pack identification procedures was irrelevant because there was no evidence that Knowles's six-pack identification of defendant was "improper." The court also pointed out that, if

7

Dr. Shomer testified, the court would be inclined to allow the prosecution to call an expert to contradict or explain Dr. Shomer's testimony.

B.  *Applicable Law and Analysis*

Expert opinion testimony is admissible on subjects that are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid. Code, § 801, subd. (a); *People v. Chavez* (2018) 22 Cal.App.5th 663, 680.)  In particular, expert testimony concerning the reliability of eyewitness identification evidence is admissible to "inform[] the jury of certain factors that may affect such an identification in a typical case . . . ."  (*McDonald*, *supra*, 37 Cal.3d at pp. 370.)

The psychological factors and other circumstances that may affect an eyewitness identification are numerous and are listed in CALCRIM No. 315, which was given in this case.  These factors include whether the witness knew or had previous contact with the person the witness identified, how well the witness could see the person, whether the witness was under stress when the witness observed the person, whether the witness was asked to pick the person out of a group or from a photographic or physical lineup, how certain the witness was when the witness identified the person, whether the witness and person were of different races, and whether there were any other circumstances that affected the witness's ability to make an accurate identification of the person. (CALCRIM No. 315.)

A trial court has discretion to exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability its admission will consume undue time, mislead the jury, or confuse the issues. (Evid. Code, § 352; *People v. Scott* (2011) 52 Cal.4th 452, 490.) Although a defendant has a "'general [constitutional] right'" to offer a defense through the testimony of his or her witnesses, a state court's exclusion of defense evidence under ordinary rules of evidence—including Evidence Code section 352—generally does not infringe upon this right. (*People v. Chavez*, *supra*, 22 Cal.App.5th at p. 681; *People v. Cornwell* (2005) 37 Cal.4th 50, 82.)

In *McDonald*, the leading California case concerning expert testimony on eyewitness identifications (*People v. Jones* (2003) 30 Cal.4th 1084, 1111), our state high court said: "[T]he decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; . . . 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' [Citation.] We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. *When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by*

9

*the jury, it will ordinarily be error to exclude that testimony.*"  (*McDonald*, *supra*, 37 Cal.3d at p. 377, italics added.)

Under *McDonald*, we review a trial court's ruling on the admissibility of expert testimony on the psychological factors affecting eyewitness identifications for an abuse of discretion.  (*McDonald*, *supra*, 37 Cal.3d at p. 370.)  The exclusion of such expert testimony "is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability."  (*People v. Jones*, *supra*, 30 Cal.4th at p. 1112; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 290-291 ["*McDonald* does not apply when an eyewitness identification is 'substantially corroborated by evidence giving it independent reliability.'"].)

In determining whether other evidence substantially corroborates an eyewitness identification and gives it independent reliability, "the court looks to the body of evidence that corroborates the eyewitness identification, i.e., whether there is substantial evidence tending to show that the eyewitness identification is itself reliable, in order to assess the probative value of the expert witness testimony.  If there is substantial evidence showing that the eyewitness testimony is reliable, the trial court may conclude that the probative value of the expert testimony would not outweigh any prejudicial effect caused by potential confusion of the issues and/or the amount of time that would be consumed by such testimony."  (*People v. Goodwillie* (2007) 147 Cal.App.4th 695, 729-730.)

10

Here, the court did not abuse its discretion in excluding Dr. Shomer's expert testimony. As the court recognized, ample other evidence substantially corroborated Knowles's identification of defendant, giving it independent reliability and substantially reducing the probative value of Dr. Shomer's testimony. Thus, the court reasonably concluded that the probative value of Dr. Shomer's testimony was substantially outweighed by the probability its admission would consume undue court time. (Evid. Code, § 352; *People v. Goodwillie*, *supra*, 147 Cal.App.4th at pp. 729-730.)

First, other evidence showed that the "black vehicle" that Knowles saw leaving the scene of the burglary was defendant's vehicle. Knowles was able to read the vehicle's license number, and Department of Motor Vehicle records showed that the vehicle, a black Chevrolet Blazer, was registered to defendant. Second, a year after the burglary, Knowles accurately identified Kemp from a six-pack photographic lineup as the second man he saw getting into defendant's vehicle after the burglary.

Third, Watkins testified that Kemp and defendant were good friends, and Watkins felt threatened when another friend of defendant's contacted Watkins and asked whether Watkins would be coming to court. Fourth, Kemp pled guilty to the burglary and admitted his involvement at trial. Kemp's ankle monitor placed him at Clark's home at the time of the burglary and at defendant's home shortly after the burglary.

Fifth, defendant's jail calls showed he was concerned that fingerprints taken from Clark's home might match his fingerprints and provide the prosecution with evidence that he committed the burglary. Sixth, defendant's jail calls also showed he was trying to "set

11

up" an alibi defense, by having several witnesses, including Kemp, say he had "nothing to do with" the burglary and was not at Clark's house at the time of the burglary.

Defendant has also not shown that the exclusion of Dr. Shomer's testimony violated his due process right to present defense evidence. Because ample evidence independently corroborated Knowles's identification, Dr. Shomer's testimony was not so vital to the defense that due process principles required its admission. (*People v. Goodwillie*, *supra*, 147 Cal.App.4th at p. 725; *People v. Cornwell*, *supra*, 37 Cal.4th at p. 82.) The exclusion of Dr. Shomer's testimony did not prevent defendant from arguing that Knowles's identification was unreliable. Knowles and Detective Libby both testified that Knowles was "hesitant" and "uncertain" in his eyewitness identification of defendant. In addition, the jury was instructed pursuant to CALCRIM No. 315 on the many factors that may affect the credibility of eyewitness testimony. As the trial court emphasized, there was nothing about the reliability of Knowles's identification that a jury could not understand, or that warranted expert testimony.

Lastly, any error in excluding Dr. Shomer's expert testimony was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) We discern no reasonable probability that defendant would have realized a more favorable result if Dr. Shomer's testimony had been admitted, given that other evidence substantially corroborated Knowles's identification of defendant and the jury was instructed pursuant to CALCRIM No. 315 on the factors that may affect the credibility of an eyewitness identification.

C. *Remand for Resentencing*

On September 30, 2018, the Governor signed S.B. 1393 which, effective January 1, 2019, amends sections 667(a) and 1385(b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.) Under the current versions of these statutes, the court is required to impose a five-year consecutive term for "any person convicted of a serious felony who previously has been convicted of a serious felony" (§ 667(a)), and the court has no discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (§ 1385(b).)

After our original opinion in this case was filed on October 3, 2018, defendant petitioned for rehearing claiming that, in light of S.B. 1393, the matter must be remanded for resentencing so the trial court may exercise its discretion to dismiss or strike the five-year consecutive term that was imposed based on his prior serious felony conviction. (§ 667(a).) We granted defendant's petition for rehearing. We have modified our original opinion to add this section and to remand the matter for resentencing pursuant to S.B. 1393 *after* January 1, 2019, the date S.B. 1393 becomes effective.

Defendant claims S.B. 1393 applies retroactively to all cases or judgments of conviction in which a five-year term was imposed at sentencing, based on a prior serious felony conviction, provided the judgment of conviction is not final when S.B. 1393 becomes effective on January 1, 2019. We agree.

13

When an amendatory statute either lessens the punishment for a crime *or*, as S.B. 1393 does, "'vests in the trial court discretion to impose either the same penalty as under the former law or a lesser penalty,'" it is reasonable for courts to infer, absent evidence to the contrary and as a matter of statutory construction, that the Legislature intended the amendatory statute to retroactively apply to the fullest extent constitutionally permissible—that is, to all cases not final when the statute becomes effective. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307-308 & fn. 5; *People v. Francis* (1969) 71 Cal.2d. 66, 76) ["[T]here is such an inference because the Legislature has determined that the former penalty provisions may have been too severe in some cases and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances."]; *In re Estrada* (1965) 63 Cal.2d 740, 744-745 [absent evidence of contrary legislative intent, "it is an inevitable inference" that the Legislature intends ameliorative criminal statutes to apply to all cases not final when the statutes become effective]; *People v. Arredondo* (2018) 21 Cal.App.5th 493, 506-507 ["Retrospective application of a new penal statute is an exception to the general rule set forth in section 3, which bars retroactive application of new Penal Code statutes unless the Legislature has expressly provided for such application."].)

In enacting S.B. 1393, the Legislature did not expressly declare that S.B. 1393, or the amendments it makes to sections 667(a) and 1385(b), will apply retroactively to all judgments of conviction which are not final on January 1, 2019, when S.B. 1393's amendments to sections 667 and 1385 go into effect. (*People v. Arredondo*, *supra*, 21

14

Cal.App.5th at pp. 509-512 (conc. opn. of Benke, J.) ["When . . . a criminal defendant argues he or she is entitled to the benefit of new legislation, we must begin with the . . . presumption, expressly set forth in section 3, that unless there is express language to the contrary, statutes are prospective only."].)  But the Legislature also did not expressly declare or in any way indicate that it did not intend S.B. 1393 to apply retroactively, and S.B. 1393 is ameliorative legislation which vests trial courts with discretion, which they formerly did not have, to dismiss or strike a prior serious felony conviction for sentencing purposes.  (Stats. 2018, ch. 1013, §§ 1-2.)

Thus, under the *Estrada* rule, as applied in *Lara* and *Francis*, it is appropriate to infer, as a matter of statutory construction, that the Legislature intended S.B. 1393 to apply to all cases to which it could constitutionally be applied, that is, to all cases not yet final when S.B. 1393 becomes effective on January 1, 2019.  (*People v. Superior Court (Lara)*, *supra*, 4 Cal.5th at pp. 307-308 & fn. 5; *In re Estrada*, *supra*, 63 Cal.2d at pp. 744-745 ["If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies."]; *People v. Conley* (2016) 63 Cal.4th 646, 657 ["The *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not."].)

15

The People concede that *if* defendant's judgment of conviction is *not* final on January 1, 2019, then S.B. 1393 *will* apply retroactively to defendant's judgment. They argue, however, that defendant's judgment "should be final" by January 1, 2019, and in any event, defendant's S.B. 1393 claim is not "ripe for adjudication" or justiciable, and should be left for a future forum, because his judgment "should" be final by January 1, 2019. (*People v. Ybarra* (1988) 206 Cal.App.3d 546, 550 [matters not ripe for adjudication should ordinarily be left to a future forum].)

We believe it is highly unlikely that defendant's judgment will be final by January 1, 2019, because he would have to exhaust all of his appeal rights by that date, even if we did not remand the matter for resentencing *after* January 1, 2019, pursuant to S.B. 1393. "'[F]or the purpose of determining the retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.'" (*People v. Vieira* (2005) 35 Cal.4th 264, 305-306.) Because it is highly unlikely that defendant's judgment will in any event be final by January 1, 2019, we remand the matter to the trial court for rensentencing pursuant to S.B. 1393, *after* January 1, 2019.[3]

---

[3] Remand for resentencing will not be futile. The record does not indicate that the court would not have dismissed or stricken defendant's prior serious felony conviction for sentencing purposes, had the court had the discretion to do so at the time it originally sentenced defendant. (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)

## IV.  DISPOSITION

The matter is remanded to the trial court with directions to resentence defendant after January 1, 2019, pursuant to sections 667(a) and 1385(b), as amended by S.B. 1393 effective January 1, 2019.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION


FIELDS
                                                                                              J.


We concur:

RAMIREZ
                    P. J.

SLOUGH
                    J.