Filed 9/26/22 P. v. Harrison CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVION HARRISON et al.,<br><br>    Defendants and Appellants. | B302288 c/w B303783<br><br>(Los Angeles County<br>Super. Ct. No. VA136832) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales, Judge. Affirmed.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant Davion Harrison.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant Enoch Frison.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Enoch Frison and Davion Harrison of the murder of Anthony Lawson. In this consolidated appeal, Frison and Harrison assert that multiple errors require reversal of their convictions. We affirm the judgments against them.

### FACTS

#### 1. The Murder

On July 26, 2014, Vincent Hunter and his mother, Mardie Moore, attended a family birthday party. Also in attendance were defendants Harrison and Frison. Both men considered Moore to be a family member, much like a grandmother or an auntie, even though neither was related to her by blood.

In the early morning of July 27, 2014, as the party was winding down, Moore became intoxicated. Hunter put his mother into the front passenger seat of her parked car and reclined it to make her more comfortable.

Murder victim Lawson and his assistant repossessed Moore's car while she slept in it. From his vantage point, Lawson could not see that Moore was in the car. Lawson quickly hooked the car to his tow truck and drove away. His assistant followed in a separate car. They drove to a nearby 7-Eleven, where they intended to more securely attach Moore's car to the tow truck.

Witness Hunter and his brother chased after the tow truck in a Chevy Camaro. Defendant Harrison and his stepbrother joined the chase in Harrison's SUV. At the 7-Eleven, Hunter got out of the Camaro to tell Lawson that his mother was sleeping in the car but before he could reach Lawson, Hunter heard gunshots. When he looked in the direction of the gunfire, he saw defendant Harrison walking back to his SUV with a gun in his hand. Lawson's assistant saw Lawson jump back into his tow truck and speed off with the Camaro and SUV in pursuit.

After the Camaro had taken off, leaving Hunter behind, Harrison told Hunter to get into his SUV. Harrison's stepbrother was driving, Harrison was in the front passenger seat, and Hunter was in the back. Hunter saw Harrison holding a gun. At some point, Hunter noticed defendant Frison had joined the chase in a separate vehicle.

Lawson's assistant called the police, left the 7-Eleven parking lot, and attempted to follow. He eventually lost sight of the speeding vehicles. During the chase, Lawson's tow truck collided with the Camaro, rendering the Camaro inoperable. Harrison and Frison continued the pursuit in separate vehicles. The chase ended about five miles from the 7-Eleven when the tow truck hit a car at the intersection of Firestone Boulevard and Rayo Avenue. Lawson got out of his truck to flee. Hunter and another witness testified at trial that two shooters fired at Lawson. Lawson was shot eight times. He died from his wounds.

## 2. The Investigation

### a. Surveillance Video Evidence

Surveillance video from 7-Eleven showed the tow truck entering the parking lot followed by a car and an SUV. The tow truck quickly drove out of the frame but the car and SUV remained in view. The video showed a figure exiting the car and walking in the direction of the tow truck. Another figure exited the SUV. The person who exited from the SUV fired in the direction of the tow truck. At trial, the prosecution presented evidence that it was Hunter who exited the car, and Harrison who exited the SUV to fire a gun in the direction of the tow truck. The prosecution also presented a series of surveillance videos that showed three vehicles chasing the tow truck five miles from the 7-Eleven to the Firestone and Rayo intersection.

### b. Ballistics Evidence

The police recovered 10 expended cartridge cases and multiple possible bullet fragments from the Firestone and Rayo intersection. Additional fired bullets were recovered from the tow truck. A fired bullet was found in the street adjacent to the 7-Eleven near where the earlier shooting had taken place.

The medical examiner opined four of Lawson's eight wounds were fatal. The coroner's office recovered five bullets during the autopsy, one of which was from a prior shooting. The firearms expert testified that the recent bullets recovered from Lawson's body came from two different firearms – a Glock pistol and a revolver. The expert testified that the Glock bullets recovered from Lawson's body during the autopsy were fired from the same Glock pistol that expended the 10 cartridge casings found at Firestone and Rayo. The expert also compared a fragment of a bullet from Lawson's body recovered at the hospital with the fired bullet recovered from the 7-Eleven. She determined they were fired from the same revolver.

On September 11, 2014, police executed a search warrant for Frison's home. From Frison's bedroom, officers recovered a gun case for a Glock pistol owned by Frison, and which contained exemplar casings from the Glock factory. At trial, a firearms expert testified that the 10 expended casings found at the Firestone and Rayo intersection were fired from the same firearm as the two exemplar casings found in Frison's bedroom.

From this evidence, the prosecution linked Frison's Glock pistol to the casings found at Firestone and Rayo and to four of the bullets found in Lawson's body. The second firearm used that night – most likely a revolver – was never recovered, but Hunter testified that the gun he saw Harrison holding appeared to be a

4

revolver.  Because the bullet fragment recovered at the hospital matched the bullet found at 7-Eleven, the prosecution's theory was that Harrison had fired both the shot at the 7-Eleven and at least one of the shots that hit Lawson at Firestone and Rayo.

    *c.     Renee Lloyd Interview*

On August 5, 2014, detectives interviewed Renee Lloyd, whose sister has a child with Harrison.  Lloyd contacted the detectives about the case the previous evening, and officers arranged an interview.

Lloyd told the detectives she was at her sister's home one afternoon when Harrison called and asked her sister to pick him up at the train station.  When he arrived home, Lloyd's sister questioned him about his car.  He responded he had already told her what happened and wanted to be left alone.  When she pursued the point, he answered, "To get rid of the evidence."

Later that evening, while they were drinking and smoking, Harrison told Renee Lloyd about the shooting.  He admitted he was the shooter and his stepbrother was the driver.  He stated, "I guess I'm trigger happy.  I should have went to the gun range.  I need to go more often."  Harrison bragged to Lloyd that he "burned the car" to avoid being apprehended.  Harrison also said, "That's what he get.  That's what he get for trying to take my grandmother car."  He also asserted, "Me and [my stepbrother] and my two cousins, we had to [do] it.  We had to.  It was for my grandmother.  We had to."  Lloyd reported to the detectives that during her conversation with Harrison, he exhibited no remorse over the shooting, just that he regretted not getting the car back from the tow truck driver.

When the detectives asked Lloyd why she came forward, she said, "To be honest, I feel like that's the right thing to do . . .

5

if it happened to me, I would want someone to come forward . . . he need[ed] to get in trouble for that. He didn't have any remorse for it. He don't care about the man."[1]

> d. *Defendants' Statements to Undercover Officers*

On September 11, 2014, undercover officers participated in a *Perkins* operation with Frison and Harrison.[2] Defendants were in separate cells.

Frison told an undercover officer he knew the police were "gonna show up sooner or later." Frison said he got rid of the "burner" and did not think he was captured on camera. When the agent asked if Frison was close to the "other individuals that are involved with you," Frison responded, "Not super close, but I watched the little man crawl all the way up from little kids." When the agent asked the name of his "crimeys," Frison replied, "Davion." (Davion is defendant Harrison's first name.)

Frison also told the undercover officer he used a Glock firearm but he left it with someone he trusted, who "broke it down in pieces" and "got rid of it." He also stated he painted his car burgundy and that it was at his girlfriend's house. The police subsequently recovered Frison's SUV from his girlfriend's garage.

---

[1] Lloyd's videotaped interview was shown to the jury and a transcript of it was admitted into evidence. At trial, Lloyd testified she did not recall the statements she made to the detectives at her interview but only contacted them because they had harassed her.

[2] *Illinois v. Perkins* (1990) 496 U.S. 292, 294 holds that "*Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement."

Originally tan, it had been painted maroon or burgundy. Frison described the shooting as a "big mistake" and believed he "fucked up." When the undercover officer proposed, "You got caught up in the heat of the moment," Frison replied, "That's it right there, point blank, period."

Meanwhile, defendant Harrison, in his custodial statements to two undercover officers, generally denied knowing what happened and said he was repeating what he had been told. He nevertheless indicated he had been at the 7-Eleven parking lot on the night of the shooting and that he did not believe he was caught on camera because it only covered the front door. He also stated, "they can't see what the fuck it is, you try to zoom, it's all blurry, dark." One of the undercover officers testified Harrison believed "his dark skin [had] a hard time being picked up on the camera."[3] Harrison also indicated he thought someone must have used a revolver in the shootings because only one type of casing was found at Rayo and Firestone.[4] He told the undercover officers that his car would not be found because he had a "connection" at the DMV.

---

[3] The defendants' jailhouse conversations were recorded and portions were played to the jury. Transcripts of the recordings were also admitted into evidence. The quality of Harrison's recording was poor and 75 percent of it was inaudible. As a result, the undercover officer testified at trial to Harrison's statements in the cell.

[4] The firearms expert testified that a revolver would not eject spent casings after it was fired while a Glock pistol would. No spent casings were found at the 7-Eleven, indicating the shots were fired from a revolver.

### 3. *The Trial*

Defendants were both charged with murder (Pen. Code, § 187, subd. (a)).[5]  Harrison was separately charged with shooting at an occupied motor vehicle arising out of the 7-Eleven incident (§ 246).  Firearm enhancements were alleged as to both counts (§ 12022.53, subds. (b)–(d)).

The People's theory at trial was that Harrison used a revolver when he fired on Lawson's tow truck at the 7-Eleven, thus committing the crime of shooting at an occupied motor vehicle.  The prosecutor also argued both defendants committed first degree murder by willfully and with premeditation shooting Lawson – Harrison with a revolver and Frison with the Glock – at Firestone and Rayo.[6]

***Prosecution evidence.***  The prosecution presented testimony from Hunter (Mardie Moore's son), Lawson's assistant, and various law enforcement personnel describing the events of that night and the subsequent investigation.  Hunter testified he saw Harrison with a gun at the 7-Eleven parking lot and that Lawson drove erratically and at a high speed during the chase.  Hunter believed Moore's car, which had not been fully secured to the tow truck, was in danger of flipping over.  Hunter also believed Moore turned on the car's hazard lights and flashed

---

[5]  All further undesignated statutory references are to the Penal Code.

[6]  The evidence at trial did not conclusively establish that the shot or shots that Harrison fired at Firestone and Rayo were fatal.  The prosecutor argued Harrison was either a direct perpetrator or an aider and abettor.  For purposes of this opinion, it is immaterial on which theory the jury relied to convict Harrison of first degree murder.

headlights in a bid for attention. Hunter identified Harrison and Frison as the shooters at Firestone and Rayo, and stated that, after the shooting, Harrison and Frison quickly left in their vehicles.

Apart from Hunter's testimony, the prosecution placed Harrison at Firestone and Rayo by introducing Harrison's school report card, which an investigator found at the intersection on the day of the murder. Harrison argued the investigators actually recovered the report card from his parents' house, which was searched three times, and not from Firestone and Rayo. Harrison pointed out that the report card was booked into the evidence locker two months after the crime scene was processed.

Jovani Arana, the driver of the car that collided with Lawson's tow truck at Firestone and Rayo, testified he and his girlfriend were initially stuck in their car because the doors were jammed. He heard two vehicles drive around his car after the collision. Seconds later, he heard gunshots. He explained he was a hunter and the gunshots sounded like they came from two different types of guns. Arana testified he eventually managed to open the car door. Although he only saw one man because of the position of the vehicles, he believed there were two men firing the shots he heard. One of the men turned back and looked at him. He could not remember their faces; nor did he otherwise identify defendants.

***Defense evidence.*** Harrison's defense at trial focused on misidentification. He argued Lawson's assistant, who saw the shooting at the 7-Eleven, never identified Harrison as the shooter, and Hunter wrongfully accused him of being the shooter to exculpate himself. In contrast, Frison did not deny shooting Lawson but argued the killing was justified because he was

9

reasonably acting in defense of Moore or, at most, the killing constituted heat of passion involuntary manslaughter.[7]

Harrison's stepfather and mother testified for the defense. Harrison's stepfather told the jury that Harrison was 21 years old at the time of the incident. The stepfather testified he saw Frison leave the party at 11:30 p.m. or midnight, before Moore's car was towed. He also recalled seeing Harrison at a house across the street when he walked outside after hearing that Moore's car had been towed. Harrison's stepfather and mother testified to the nonviolent character of both defendants.

***Verdict and Sentencing.*** The jury found Harrison guilty of first degree murder and shooting at an occupied motor vehicle. It found true the firearm enhancement allegations as to both counts. The trial court sentenced Harrison to an aggregate indeterminate term of 50 years to life in state prison.

The jury found Frison not guilty of first degree murder, but guilty of second degree murder and found true the firearm allegation. The trial court sentenced Frison to 25 years to life in state prison. We consolidated defendants' appeals.

### DISCUSSION

Frison and Harrison each filed briefs on appeal. Frison raises only one issue that does not overlap with those raised by Harrison. We begin by addressing Frison's separate claim of error – whether substantial evidence supports his second degree

---

[7]     At trial Frison's counsel argued both the complete defense of another and in the alternative, that defendant was guilty of manslaughter. The trial court instructed on first and second degree murder, defense of another, and heat of passion voluntary manslaughter. On appeal, Frison does not pursue defense of another, only heat of passion manslaughter.

10

murder conviction. We then consider the dozen or so issues raised by Harrison, some of which apply to Frison.[8]

## 1. *Substantial Evidence Supports Frison's Conviction for Second Degree Murder*

Frison, who fired four bullets into Lawson's body, asserts there is insufficient evidence to support a second degree murder conviction because the evidence showed he acted in the heat of passion. At most, he says, he was guilty of voluntary manslaughter. As we have observed, the jury was instructed on voluntary manslaughter as well as first and second degree murder. We uphold the conviction.

### a. *Standard of Review*

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] Our review must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] . . . . [T]he relevant inquiry on appeal is whether, in light of all the evidence, 'any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

When undertaking a substantial evidence inquiry, "the testimony of a single witness that satisfies the standard is sufficient to uphold the finding" even if there is a significant

---

[8] Frison's reply brief states that he "joins in appellant Harrison's arguments on all claims raised by both appellants."

amount of countervailing evidence.  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052; see also Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"]; *People v. Robertson* (1989) 48 Cal.3d 18, 44.)  And "[i]t is well settled that, under the prevailing standard of review for a sufficiency claim, we defer to the trier of fact's evaluation of credibility."  (*People v. Richardson* (2008) 43 Cal.4th 959, 1030.)

       b.      *Heat of Passion Voluntary Manslaughter Principles*

"Murder is the unlawful killing of a human being with malice aforethought."  (See § 187, subd. (a).)  A murder may be reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an ordinary person with an average disposition to act in the heat of passion, that is, rashly or without due deliberation and reflection.  (*People v. Enraca* (2012) 53 Cal.4th 735, 758.)

"A heat of passion theory of manslaughter has both an objective and a subjective component.  [Citations.]  [¶]  ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " ' "  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  Legally sufficient provocation is that which " 'causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.'  [Citation.]  Further, the 'proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment.' "  (*People v. Nelson* (2016) 1 Cal.5th 513, 539 (*Nelson*).)  The facts and circumstances must be " ' "sufficient to arouse the passions of the ordinarily reasonable man." ' "  (*Ibid.*)

As for the subjective element, the defendant "must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra*, 47 Cal.4th at p. 550; *Nelson, supra*, 1 Cal.5th at p. 539.) Both elements require proof the victim instigated the incident, meaning "the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

c.     *Analysis*

We conclude substantial evidence supports the jury's finding that Frison committed second degree murder: Frison followed Lawson for five miles from the 7-Eleven to Firestone and Rayo. He did not shoot at Lawson during the high-speed chase but opened fire only after Lawson had stopped the tow truck. When Lawson exited his truck to flee, Frison fired 10 rounds at Lawson's back from close proximity, killing him. Frison immediately fled the scene. At no point prior to the shooting did Frison attempt to determine whether Moore was injured.

Frison asserts the evidence discloses a reasonable person in his position would have reacted from passion and not from reason or judgment because he considered Moore to be family and Lawson had placed Moore in great danger by his erratic driving and high speeds.

By finding him guilty of second degree murder, the jury necessarily rejected Frison's heat of passion defense. Putting to one side whether Frison was actually influenced by a strong passion, substantial evidence supports the jury's implied finding that his conduct was not objectively reasonable.

Here, the evidence showed Lawson towed Moore's car, not knowing Moore was asleep inside. Frison and others unsuccessfully attempted to flag Lawson down. When Lawson

13

arrived at the 7-Eleven parking lot, Harrison shot at him. Thus began a five-mile chase during which Lawson, who apparently was still unaware of Moore's presence in the car, drove at high speeds. The chase ended after Lawson collided with two cars and attempted to flee under a barrage of bullets.[9]

Given these facts, substantial evidence supported the jury's finding that any provocation resulting from Lawson's unexpected endangerment of Moore would not have induced a reasonable person to lose all reason and judgment, and shoot Lawson. Courts have found insufficient provocation even where there has been deliberate, not mistaken or unintentional, conduct by the victim to injure, harass, or threaten the defendant. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1214 [bickering, yelling, cursing, and threats by victim would not have provoked reasonable person to act rashly from passion]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [victim called defendant a "mother fucker" and repeatedly taunted defendant to take out his weapon, if he had one, and use it]; *People v. Najera* (2006) 138 Cal.App.4th 212, 226 [calling defendant a "faggot" was insufficient to cause an ordinary person to lose reason and judgment under an objective standard]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739 [victim smirked at defendant, gave him dirty looks, and called him names]; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705 ["neither simple trespass nor simple assault constitute provocation sufficient to

---

**9** At trial, Hunter testified Lawson collided with parked cars as well as with Arana's car and the Camaro driven by Hunter's brother. Video of the chase, compiled from nine surveillance cameras along the route, did not show the truck colliding with any parked cars. The video, however, did not show the entire five-mile chase.

14

reduce the killing to manslaughter"].)  Defendants do not suggest Lawson intended to kidnap Moore.  When Frison fired at Lawson, the tow truck had stopped, and Moore appeared to be safe.

Even if Lawson's conduct was some evidence of provocation for the jury to consider, in *People v. Bloyd* (1987) 43 Cal.3d 333, 350, our Supreme Court described the rule we adopt here:  "[I]t remains the jury's exclusive province to decide whether the particular facts and circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion.  [Citations.]  Here, the jury was properly instructed on voluntary manslaughter and heat of passion or sudden quarrel.  They found malice, and we conclude the evidence is sufficient to support the finding."

2. ***The Admission of Frison's Reference to Harrison in His Conversation with an Undercover Agent Was At Most Harmless Error; Severance of the Trial Was Not Required***

Several of Harrison's arguments arise from the admission of Frison's statement to the undercover officer that referred to "Davion" (i.e., Harrison) as Frison's "crimey."  The trial court admitted Frison's entire statement as a declaration against Frison's penal interest.  On appeal, Harrison argues the portion of Frison's statement implicating him was inadmissible hearsay and its admission violated his constitutional rights to confront an adverse witness, due process, and a fair trial.  In a related argument, he contends the trial court erred when it denied his request for severance.

a. *Proceedings Below*

At the end of his jailhouse conversation with an undercover officer, Frison and the officer discussed transferring to "the

15

County" for processing. The officer then told Frison the police will "snatch up your crimeys," and wondered whether the officer might "run into them fools in the County too," apparently referring to Frison's coparticipants. The undercover officer asked, "What they call him?" Frison stated he did not know his street name but his real name is Davion. The agent then stated, "Davion, oh, that's your crime partner?" (The record does not reflect whether Frison answered the question.)

In a pretrial motion, Harrison moved for severance, or in the alternative, to preclude the incriminating portion of Frison's statement to the undercover agent. He argued Frison's statement naming Harrison to the undercover agent was "prejudicial and incriminating" under *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), and testimonial under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). The trial court denied severance.

The prosecutor moved to admit Frison's statement against both defendants as a statement against penal interest. The prosecutor argued that, as to Harrison, Frison's statement was admissible under Evidence Code section 1230 because the statement was nontestimonial and trustworthy.

The trial court admitted Frison's statements against both defendants. The court found persuasive Frison's consistent reference to "one person, one male" despite the undercover agent's questions about multiple coparticipants. The court reasoned:

> ". . . [Frison] is placing himself as the person who was there, did what he had to do, he messed up, he should have handled it differently, but he was carrying a gun and he hid the gun, gave it to somebody to get rid of it, somebody he

16

trusted. He painted the car. He refers to the location, the circumstances of the repo. guy with his aunt being inside the car. And then refers to Mr. Davion [Harrison] as the one person involved in this. Although, he doesn't say – and that goes to the fact that it's a declaration against interest because he doesn't say what Davion does, just refers to Davion was involved with him."

b.     *Admission of Frison's Statement*

We will assume that the trial court erred in admitting the "crimey" statement as a declaration against penal interest, but find that any such error was harmless. State law errors in the admission of evidence are governed by the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619.)[10] " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; accord, *Watson,* at p. 836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable

---

[10]     Harrison also contends the admission of Frison's statement violated his constitutional rights. Even if we applied the higher federal standard of harmless error beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24, we would reach the same result.

17

probability the error of which the defendant complains affected the result.' " (*Beltran*, *supra,* at p. 956; accord *People v. Clark* (2021) 62 Cal.App.5th 939, 968.)

Here, the evidence demonstrating Harrison's participation in Lawson's murder was overwhelming: Harrison confessed to Renee Lloyd that he was the shooter; Harrison indicated to the undercover *Perkins* agent that he was present at the 7-Eleven; Hunter testified Harrison was one of the shooters; Harrison's report card was found at Rayo and Firestone; and the ballistics evidence showed a fragment of a bullet found at the 7-Eleven matched one found in Lawson. By contrast, the evidence supporting a different outcome was relatively weak: Harrison argued at trial that Hunter lied about Harrison's participation in the shooting to exculpate himself, Harrison told the *Perkins* officer he was not present, Lawson's assistant did not identify him as the shooter at the 7-Eleven, and the police did not recover his report card at Firestone and Rayo but at his parents' house.

The record shows the prosecutor did not rely solely or even primarily on Frison's statement because Frison did not elaborate as to Harrison's specific role in the events — whether he was a shooter, a driver, participated in some other way, or just was there. Frison's vague statement referencing Harrison was cumulative to the other, more specific evidence outlined by the prosecutor during her closing:

"So putting it all together, what do we have that establishes Davion Harrison is the person who shot at the 7-Eleven, is the person who was one of the murderers at the Firestone intersection? We have got the eyewitness. We have got the bullets, the revolver evidence. We have got the report card

that was found at the scene. And you will have that photograph, by the way, that shows where the report card was found.

"You have Mr. Harrison who was named by Mr. Frison in that cell recording. Mr. Frison did not appear to be aware he was being recorded, the evidence has shown. And at the very end, when he is asked, 'Hey, I might run into your crimey. What is the name of your crimey?' and he says, 'Davion;' so Mr. Frison also provides the name of the other person that was committing the murder with him.

"We have got Mr. Harrison's statements in the cell. What we have specifically there is he is talking about how the 7-Eleven camera wouldn't pick him up because he was to the side and it covers the front. . . . So listen to it. You will hear him slip and he relates very specific details during this recorded jail conversation where he is talking about details that who would know? The murderer would know. . . .

"And, of course, we have got the confession to Renee Lloyd."[11]

Harrison attempts to discount the evidence we have cited, contending it only places him at the 7-Eleven, not at Firestone and Rayo. He asserts his own statements to Lloyd and the *Perkins* agent placing him at the 7-Eleven did not "ipso facto prove beyond a reasonable doubt he shot Lawson at Firestone and Rayo." He also contends the jury's request for a readback of Hunter's "testimony identifying Davion Harrison at [the] final scene" demonstrated they struggled with his misidentification defense, implying the evidence against him was not

---

[11] As we have already observed, Renee Lloyd's statement to officers about Harrison's inculpatory statements was videotaped and played to the jury.

overwhelming. According to Harrison, Frison's statement thus "unfairly tipped the balance against Harrison."

We are not persuaded. Harrison ignores that he confessed to Lloyd that he was the shooter without limiting his culpability to a single location. As to his statement to the *Perkins* agent, the jury could reasonably infer Harrison was at the 7-Eleven from his assertion that the cameras at the 7-Eleven would not have picked him up because they were facing the wrong way and because he was dark skinned on a dark night. Harrison would not know any of this if he were not at the 7-Eleven. The video evidence showed that the 7-Eleven shooter got back into the SUV in which he arrived and the same SUV is shown in multiple videos pursuing Lawson's tow truck to Firestone and Rayo. The video evidence and Harrison's own statements thus link his presence at the 7-Eleven with the shooting at Firestone and Rayo even without Hunter's testimony.

Given the evidence connecting Harrison to Rayo and Firestone, we disagree with Harrison's speculation that his guilt was a close question simply because the jury requested read back of Hunter's testimony placing Harrison at Rayo and Firestone.

Harrison has failed to show it is reasonably probable a more favorable result would have been obtained absent the admission of Frison's statement.

c.     *Severance*

Harrison's challenge to the admission of Frison's incriminating statement continues: He contends the court prejudicially erred when it refused to sever the trial, thus depriving him of due process and a fair trial.

"The Legislature has expressed a preference for joint trials; therefore, two or more defendants jointly charged with crimes

20

must be tried together unless the court orders separate trials." (*People v. Sanchez* (2016) 63 Cal.4th 411, 463 (*Sanchez*); *People v. Manriquez, supra,* 37 Cal.4th at p. 574; Pen. Code § 1098.) "The court has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial." (*Sanchez,* at p. 464.) "We review the court's denial of severance for abuse of discretion based on the facts as of the time of the ruling. If the court properly denied severance at the time, the reviewing court may reverse a judgment only if it finds that the joint trial caused gross unfairness that denied due process." (*Ibid.*)

Here, both defendants were charged with the murder of the same victim arising out of a single chain of events. These factors presumptively supported the trial court's reasonable denial of severance. (*People v. Tafoya* (2007) 42 Cal.4th 147, 162.)

Harrison argues that the admission of Frison's statement required severance under *Bruton, supra*, 391 U.S. at page 137. In *Bruton*, the high court held that the introduction of a codefendant's confession implicating the defendant in a joint trial violated the confrontation cause, even if the jury had been instructed to consider the confession only against the codefendant.

*Bruton* does not control here. The confrontation clause implicates only hearsay statements that are testimonial (*People v. Cage* (2007) 40 Cal.4th 965, 981), and Frison's statement was not testimonial. The genesis of this rule is two United States Supreme Court opinions, *Davis v. Washington* (2006) 547 U.S. 813, 825 ["statements made unwittingly to a Government

21

informant" "were clearly nontestimonial"] and *Crawford, supra,* 541 U.S. at page 36, both of which followed *Bruton* by some three decades.  Our Supreme Court in *People v. Cortez* (2016) 63 Cal.4th 101, 129 held in a setting similar to this one that the *Bruton* "decision is inapposite" and that in *Davis v. Washington, supra,* "the high court unequivocally held 'that the confrontation clause applies only to testimonial hearsay statements and not to [hearsay] statements that are nontestimonial.' "

As our colleagues in Division 6 stated in *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402 (*Arauz*), "[S]tatements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause."  (See also *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67 ["To be 'testimonial' under *Crawford*, the statement must have been "given *and* taken primarily for the purpose [of] . . . establish[ing] or prov[ing] some past fact for possible use in a criminal trial."].)  Harrison urges that *Arauz* was wrongly decided.  We disagree and apply the Supreme Court's decisions in *Davis v. Washington* and *Crawford v. Washington* to conclude that *Bruton* did not require severance.

Nor was severance compelled because of conflicting defenses.  As an initial matter, Frison's and Harrison's defenses were not antagonistic.  Antagonistic defenses are ones that are irreconcilable, such as when the defendants cast blame on one another.  (*People v. Hardy* (1992) 2 Cal.4th 86, 168.)  Neither defendant here put blame on the other.  Nor were their defenses otherwise irreconcilable; that is, the jury's decision to accept or reject Harrison's defense that he was not present during the shooting had no bearing on whether it accepted or rejected Frison's defense that he shot Lawson in defense of Moore.  (See also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 42

[antagonistic defenses did not overcome the "abundant" independent evidence establishing both defendants' guilt].)

Harrison relies on *People v. Chambers* (1964) 231 Cal.App.2d 23 and *United States v. Tootick* (9th Cir. 1991) 952 F.2d 1078, to support his severance argument. Those cases are distinguishable. *Chambers* had nothing to do with the confrontation clause or admission of hearsay. The court found that the conduct alleged against one defendant would be too prejudicial against the other defendant in a joint trial and reversed the defendant's conviction on that basis. (*Chambers, supra,* at pp. 28–29.)

In *Tootick,* each defendant argued that the other defendant acted alone. The defendants presented mutually exclusive defenses where the acceptance of one party's defense compromised the acquittal of the other party. (*Tootick, supra,* 952 F.2d at pp. 1081–1082.) Again, that is not our case.

### 3. *The Prosecutor Did Not Commit Misconduct During Closing Argument*

Defendants next take issue with statements made by the prosecutor during her closing arguments. Harrison contends she misstated the law regarding the burden of proof and heat of passion voluntary manslaughter. She additionally appealed to the passion and prejudice of the jury by labelling the defendants as "murderers" and misstated the evidence. Frison joins in some of these arguments.

#### a. *Legal Principles*

The prosecution has broad discretion to argue to the jury its view of what the evidence shows. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.) " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the

23

defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid*.) We thus review a claim of prosecutorial misconduct under the abuse of discretion standard of review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

The abuse of discretion standard does not afford a prosecutor carte blanche to commit misconduct during argument to the jury. " ' "[W]hile he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." [Citations.]' " (*People v. Daggett* (1990) 225 Cal.App.3d 751, 759; see e.g. *People v. Arredondo* (2018) 21 Cal.App.5th 493 ["relentless" reference to defendants as "cockroaches"].)

    *b.*    *Misstatements Relating to the Burden of Proof*

Harrison contends the prosecutor "eviscerated" her burden to prove her case beyond a reasonable doubt in three ways: (1) urging the jury to look at all the evidence rather than "one little piece;" (2) arguing, "I have always pointed you to the specific evidence in support of what I am talking about;" and (3) stating the jury's verdict must be based on evidence, not an assumption.

As an initial matter, Harrison has failed to preserve the misconduct claim because he failed to object at the time and request a curative jury instruction. (*People v. Winbush* (2017) 2 Cal.5th 402, 482 (*Winbush*); *People v. Williams* (2013)

24

56 Cal.4th 630, 671 (*Williams*).)   Even if the claims were preserved, these comments do not approach misconduct.

Most telling, each argument comports with the court's instructions to the jury that it must consider all the evidence in reaching its verdict.  (See e.g., CALCRIM No. 223 ["You must decide whether the fact in issue has been proved based on all the evidence"]; CALCRIM No. 375 [jury "must impartially compare and consider all the evidence that was received throughout the entire trial"]; CALCRIM No. 200 [that it "must decide what the facts are . . . based only on the evidence that has been presented"]; CALCRIM No. 301 ["Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence"].)  Whether considered together or separately, the prosecutor did not minimize the People's burden to prove its case beyond a reasonable doubt.

Defendants also claim the prosecutor's comments conflict with the court's circumstantial evidence instructions.  We find no conflict.

c. *Misstatements Related to Provocation and Heat of Passion Voluntary Manslaughter*

Defendants contend the prosecutor misled the jury on the provocation and heat of passion elements of voluntary manslaughter by arguing defendants provoked Lawson first and could not use that provocation to justify murder.  Again, defendants have forfeited this issue because neither defendant objected to the argument, nor did they request a jury instruction on the subject.  (*Winbush, supra,* 2 Cal.5th at p. 482; *Williams, supra,* 56 Cal.4th at p. 671.)

In any event, the prosecutor did not misstate the law; the initial provocation must come from the victim, not the defendant.

25

(*People v. Lee* (1999) 20 Cal.4th 47, 59; *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312.)  By her comments, the prosecutor merely questioned who initiated the provocation that defendants claim led to the killing:  whether Harrison initiated it by shooting at Lawson at the 7-Eleven or whether Lawson initiated it by towing Moore's car with Moore in it. This was not misconduct but a direction to the jury to decide what happened.

      d.     *Photographs of the Defendants Labelled "Murderer"*

Defendants next contend the prosecutor improperly vouched and appealed to the jury's passion and prejudice when she presented photographs of the five people who chased Lawson. The photographs, displayed on a PowerPoint slide, had a description extended diagonally over each person's face in red capitalized letters and bold font.  Harrison's photograph was labelled "7-11 SHOOTER THEN MURDERER," Harrison's stepbrother was labelled "SUV DRIVER AIDER/ABETTER," Hunter's brother was labelled "CAMARO DRIVER," Hunter was the "WITNESS," and Frison was the "SUV DRIVER MURDERER."  The trial court overruled defense counsels' objections.

On appeal, defendants contend the labels were inflammatory, constituted improper vouching and referred to matters not in evidence.  Frison additionally claims misconduct because Hunter is shown in a favorable light, as a smiling witness, whereas the other individuals were not smiling in their photographs.

We find no misconduct.  The prosecution has broad discretion to argue to the jury its view of what the evidence shows.  (*People v. Spector, supra,* 194 Cal.App.4th at p. 1403.)  The slide set forth the prosecution's theory of the case:  Both

defendants were charged with murder and Harrison was charged with shooting at an occupied vehicle.  Meanwhile, Hunter testified at trial as a witness; Harrison's stepbrother drove Harrison's SUV, thereby enabling Harrison to pursue Lawson; and Hunter's brother drove the Camaro.  We see no likelihood that the passions of the jury were inflamed by a pictorial representation that brought home the testimony about the various participants and their roles.  (See e.g., *People v. Edwards* (2013) 57 Cal.4th 658, 742 [no misconduct where prosecutor simply asserted based on the evidence that defendant was the "killer"].)

Defendants' reliance on *People v. Arredondo, supra,* 21 Cal.App.5th 493 is unavailing.  There, the prosecutor repeatedly throughout the trial called the defendants and other participants in the crime "cockroaches," thus dehumanizing them and suggesting they were not entitled to any individual consideration or justice.  (*Id.* at p. 503.)  That is not the case here.

Nor are we persuaded the prosecutor improperly vouched for anyone.  Vouching " ' "involves an attempt to bolster a witness by reference to facts outside the record." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206–207.)  Here, the labels and photographs did not suggest the prosecutor had personal knowledge of facts outside the record, facts which enhanced her case.

### e.    *Misstatement of the Evidence*

Harrison alone contends the prosecutor misstated the evidence during her closing argument.  He has failed to preserve this issue because he did not object to these statements at the time they occurred.  Nor did he request a curative jury

27

instruction.  (*Winbush, supra,* 2 Cal.5th at p. 482; *Williams, supra,* 56 Cal.4th at p. 671.)

We also reject the argument on its merits.  Harrison contends four comments were improper.  We conclude each represents reasonable commentary (including by inference) on the evidence.  (*People v. Jackson* (2016) 1 Cal.5th 269, 349.)

(1) The prosecutor asserted Harrison knew details about the crime that only the murderer would know, including that after he was shot, Lawson was seen "twitching."  This was a fair comment on Harrison's statement to the undercover officer that Lawson was twitching after he was shot.  At trial, Hunter testified Lawson was unresponsive after the shooting.  The prosecutor merely asked the jury to infer that no one besides the murderer could have seen Lawson twitching if Hunter, who observed Lawson almost immediately after the shooting, did not.

(2) The prosecutor asserted the video of the shooting at Firestone and Rayo showed witness Arana "opening the door to peek" when, in fact, the video did not show Arana opening a door.  Even if we were to conclude the evidence did not show the door opening, any concern was immediately cured by the prosecutor's exhortation that the jurors watch the video frame by frame to ascertain what happened.

(3) The prosecutor speculated why Harrison failed to question his parents about whether the report card was found in their home rather than at Firestone and Rayo.  This was not misconduct.  The prosecutor did nothing more than attempt to dispel Harrison's conspiracy theory regarding when and where the police found the report card.

(4) The prosecutor asserted "both defendants [got] rid of their cars and their weapons" when there was no affirmative

28

evidence Harrison got rid of a gun. This comment was a reasonable inference from the evidence. The testimony was that a second gun was fired that night: Hunter testified he saw Harrison with a gun, and a fired bullet was recovered at 7-Eleven; and Arana testified he heard two different types of guns being fired at the murder scene. The second gun was never recovered. Harrison admitted to his girlfriend's sister that he got rid of his car. From this evidence, the prosecutor could fairly argue that Harrison also got rid of his gun.

**4.** ***The Failure to Instruct on Accomplice Testimony and on Defense of Another as to Harrison Were Harmless***

Harrison next argues the trial court prejudicially erred when it instructed the jury regarding accomplice testimony and imperfect defense of another. In determining instructional error, we consider the instructions as a whole and assume the jurors are "intelligent persons and capable of understanding and correlating" the jury instructions they are given. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

*a. Accomplice Testimony Instructions*

Harrison first contends the trial court erred by failing to instruct the jury that Hunter's trial testimony and Frison's jailhouse statement required corroboration because the two men were accomplices to the crime. He contends the trial court should have given CALCRIM Nos. 301, 334 and 373.[12] We find any error harmless.

---

[12] CALCRIM No. 301 includes a bracketed portion to be given if the testimony of an accomplice or other witness requires corroboration. (Bench Notes to CALCRIM No. 301 (Nov. 2021); *People v. Chavez* (1985) 39 Cal.3d 823, 831–832.)

29

The trial court has a sua sponte duty to instruct that a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111; *People v. Tobias* (2001) 25 Cal.4th 327, 331.) "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' [Citation.] To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citation.] ' "[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." [Citation.]' " (*People v. Avila* (2006) 38 Cal.4th 491, 562–563.)

Here, there was sufficient corroborating evidence connecting Harrison to the charged crimes without Hunter's

---

CALCRIM No. 334 provides, in relevant part, that if the jury decides the witness is an accomplice, the jury may use the statement or testimony of the accomplice that tends to incriminate the defendant to convict the defendant only if the statement or testimony is corroborated by independent evidence tending to connect the defendant to the commission of the crime.

CALCRIM No. 373 advises the jury not to speculate why "someone who appears to have been involved might not be a codefendant in this particular trial." It includes a bracketed portion which reads, "[This instruction does not apply to the testimony of <insert names of testifying coparticipants>.]"

30

testimony or Frison's statement.  In her videotaped statement, Renee Lloyd told the police that Harrison admitted his participation in the murder.  Harrison indicated to the undercover agent that he was at the 7-Eleven but that he was not caught on camera due to its location and his dark skin.  Harrison's report card was found at the murder scene.  Given this independent evidence, any error in failing to instruct on accomplice testimony was harmless.[13]

      b.     *Instructions on Defense of Another*

Harrison also challenges the trial court's direction to the jury, over his objection, that the imperfect defense of another instruction could be applied only to reduce Frison's murder charge to voluntary manslaughter and not to Harrison, despite the fact Harrison was "in the exact same place as" Frison.  Even if we were to assume that the instruction should have been given as to Harrison, any error was harmless.  Imperfect self-defense or imperfect defense of another is not a true defense; it is rather "a shorthand description" of one form of voluntary manslaughter, a lesser included offense of murder.  (*People v. Rogers* (2006) 39 Cal.4th 826, 883.)

"Any error in failing to instruct on imperfect defense of others is state law error alone, and thus subject, under article VI, section 13 of the California Constitution, to the harmless error test articulated in *People v. Watson*[, *supra,* 46 Cal.2d at p. 836]." (*People v. Randle* (2005) 35 Cal.4th 987, 1003 overruled on a

---

[13]     For the same reasons, we reject Harrison's argument that the trial court's failure to give accomplice instructions violated his federal constitutional right to due process and a fair trial. (*People v. Lewis* (2001) 26 Cal.4th 334, 371.)

different ground by *People v. Chun* (2009) 45 Cal.4th 1172, 1201; see *People v. Gonzalez* (2018) 5 Cal.5th 186, 209.)[14]

When Harrison fired multiple shots at Lawson, the tow truck had stopped and Lawson was fleeing. There is nothing to suggest that Lawson presented any danger to Moore at that time. No reasonable jury could have found that Harrison was defending Moore under these circumstances. In any event, the jury rejected the defense of another doctrine as to Frison. No reasonable jury would have found it applied to Harrison and not to Frison.

### 5. *Trial Counsel Was Not Ineffective and Defendants Would Not Have Received a Different Result*

Defendants contend their trial counsel rendered ineffective assistance in a number of ways.[15] We find none.

---

[14] Harrison contends prejudice in this instance should be assessed under the standard articulated in *Chapman, supra,* 386 U.S. at page 24. (Compare *People v. Franklin* (2018) 21 Cal.App.5th 881, 890–891 [stating the standard is unsettled] with *People v. Schuller* (2021) 72 Cal.App.5th 221, 238 [indicating *Watson* standard applied], review granted Jan. 19, 2022, S272237.) We need not decide the issue because the error was harmless under either standard.

[15] To the extent defendants allege deficient performance by trial counsel in connection with their other claims of error, such as failing to object to the prosecutor's purported misconduct, to the jury instructions, or to dismissal of a juror, we either have determined no error occurred or separately address the issue in the course of our analysis. "Counsel's failure to make a futile or unmeritorious objection is not deficient performance." (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092 (*Beasley*).)

*a.      Legal Principles*

"To demonstrate ineffective assistance of counsel, defendant must show both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*People v. Cleveland* (2004) 32 Cal.4th 704, 746 (*Cleveland*).) "Judicial scrutiny of counsel's performance must be highly deferential. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 687–696.)

*b.      Firearms Expert Methodology and Conclusions*

Defendants argue they received ineffective assistance of counsel when their trial counsel failed to challenge the methodology and conclusions of the prosecution's firearms expert. Relying on *People v. Azcona* (2020) 58 Cal.App.5th 504, 510 (*Azcona*), defendants assert the expert's use of microscopic comparison of bullet markings and toolmark analysis was undermined by recent studies, and trial counsel should have more extensively cross-examined the expert.

The firearms expert in *Azcona* used the same methodology to compare bullet casings as the prosecution's firearms expert used in this case. The *Azcona* defense counsel presented legitimate criticism from credible sources that undermined the reliability of the method used and cast doubt on the expert's conclusion. (*Azcona, supra,* 58 Cal.App.5th at p. 512.) While the court held this contrary evidence did not render inadmissible the testimony of the prosecution's expert, the court found that the

33

defense evidence was relevant and important for the jury to consider in assessing the expert testimony. (*Ibid.*)

"[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make." (*Cleveland, supra,* 32 Cal.4th at p. 746.) Defense counsel could have made tactical decisions not to challenge the expert's testimony here because the evidence was not critical to their respective defenses. Frison admitted he shot Lawson; the expert's testimony tying the casings at the crime scene to the casings in Frison's bedroom was not significant to Frison's defense that he acted in defense of Moore. As to Harrison, the expert's testimony was not significant to Harrison's misidentification defense. The expert did not identify Harrison as a shooter, only that a bullet recovered from Lawson's body was fired from the same gun as a bullet found at the 7-Eleven. On this record, we cannot say there was no tactical reason to avoid further cross-examination of the firearm expert.

c. *Renee Lloyd Opinion on Remorse*

Harrison also faults his trial counsel for failing to object to Renee Lloyd's statement to the police that he lacked remorse for the shooting. Harrison asserts Lloyd's comments were irrelevant, speculative opinions about his state of mind because "remorse is irrelevant at the guilt phase." (*People v. Jones* (1998) 17 Cal.4th 279, 307.) This evidence was not offered to prove that Harrison was a cold-blooded killer. Rather, it was to put into context the apparent reason why Lloyd talked to the police and why she was lying when she said at trial she could not remember what she had told the police. Although she claimed she only met with the law enforcement because officers had harassed her, she told a different story when interviewed: She believed Harrison

"need[ed] to get in trouble for that [murder]. He didn't have any remorse for it. He don't care about the man." Because Lloyd's testimony was admissible, any objection would have been futile. (*Beasley, supra,* 105 Cal.App.4th at p. 1092.)

Harrison also contends his counsel was deficient for failing to object during the prosecutor's closing argument when she repeated a portion of Lloyd's statement relaying Harrison's confession and argued: "That's what you get. That's what Steve Lawson gets for trying to take their mother's (*sic*) car. And this provides you some insight into what Mr. Harrison was thinking when he committed this murder." The argument was fair comment on the evidence, particularly on the statements Lloyd made to the police.

### d.    *Alternate Defense Theories*

Harrison next contends his trial counsel rendered ineffective assistance by failing to offer alternate theories similar to what Frison's counsel argued: provocation-based second degree murder, imperfect and perfect defense of another, and heat of passion voluntary manslaughter. Harrison's trial counsel instead focused on reasonable doubt and misidentification, attacking the prosecution's evidence by contending, among other things, that Hunter lied about Harrison being the shooter. Trial counsel also emphasized a lack of physical evidence connecting Harrison to the crime and Harrison's own statements to the undercover officer that he was not present at the scene of the crime.

"Failure to argue an alternative theory is not objectively unreasonable as a matter of law." (*People v. Thomas* (1992) 2 Cal.4th 489, 531; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1005 [counsel was not ineffective for arguing

identification rather than a lesser included offense to first degree murder].)  Again, on this record, we cannot say that no reasonable attorney would have made this tactical choice.

  *e. Misstatement Regarding the Burden of Proof*

  Harrison next faults his trial counsel for comparing the reasonable doubt standard to the decision to marry and a "rickety bridge."  We conclude counsel did not misstate the law regarding reasonable doubt.

  At closing, Harrison's trial counsel argued:  "The first thing that the judge said was the law regarding reasonable doubt. . . . There's something about abiding conviction in there.  Abiding conviction, I believe, means something that's long lasting.  You are not going to make a quick easy decision.  You are going to live with your decision because it's an important decision.  When you get married, you are not just going to get married – well, most of us won't.  You are going to reflect.  You are going to think about it.  You are going to make a long lasting decision when you get married because it has life-long consequences."

  Counsel ended his closing argument with a picture of a "rickety old bridge" and stated, "You guys are going to have to look at that bridge and see, 'is that a reliable bridge?  Do I really want to walk on that bridge?  Is that reliable?'  You don't have to walk on that bridge.  Davion has to walk on that bridge.  Is that reliable?  You can come back with not guilty because Davion wasn't there.  He was not the shooter.  He wasn't on that 7-Eleven video, and he tells us.  Your job is to determine that bridge is reliable for Davion to walk on."

  Relying on *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36, Harrison argues these comments lowered the prosecutor's burden of proof.  In *Nguyen,* it was the prosecutor – not defense counsel –

who suggested the reasonable doubt standard was used in daily life to decide such questions as whether to change lanes when driving or whether to marry. The court found the argument improper but not prejudicial. (*Id*. at pp. 36–37.) Defense counsel here did not suggest a burden of proof other than beyond a reasonable doubt or that the jury's decision was comparable to changing lanes. He argued that reasonable doubt was something that was lasting and had "life-long consequences." Counsel drew an analogy to the "abiding conviction" found in the reasonable doubt instruction.

We find the rickety bridge argument on appeal even less persuasive. The rickety bridge metaphor did not equate the jury's decision about defendants' guilt or innocence to decisions relating to "the ordinary affairs of life." It was instead a visual cue to support counsel's argument that, like the bridge, the prosecution's evidence was unsound.

### f. *Jury Instructions*

Harrison also contends trial counsel was deficient when he specifically requested the trial court remove CALCRIM No. 3470 from the jury instructions. CALCRIM No. 3470 sets forth defense of another as a defense to a non-homicide and would have applied to the charge for shooting at an occupied vehicle. The court instead gave CALCRIM No. 965, which sets forth the elements of shooting at an occupied motor vehicle and which requires the jury to find "[t]he defendant did not act in defense of someone else."

A review of these instructions discloses a tactical reason for trial counsel's decision to forego CALCRIM No. 3470 in favor of CALCRIM No. 965. CALCRIM No. 3470 would have required the jury to find Harrison reasonably believed Moore was in danger and an immediate use of force was necessary. It also required

37

the jury to find Harrison "used no more force than was reasonably necessary to defend against that danger." (CALCRIM No. 3470.) By contrast, CALCRIM 965 had none of this language. Trial counsel could reasonably have decided to avoid the more stringent requirements of CALCRIM No. 3470.

Harrison also contends his trial counsel was deficient for failing to request CALCRIM No. 305: "You have heard evidence that defendant Frison made a statement (out of court/before trial). You may consider that evidence only against him, not against any other defendant." The parties addressed the admissibility of Frison's statement as to both defendants in their pretrial motions. The trial court found the statement was admissible. Any further objection would have been futile. (*Beasley*, *supra,* 105 Cal.App.4th at p. 1092.) In any case, as we discuss in section 2, the admission of Frison's statement to police that referenced Harrison was not prejudicial. Because the second prong of an ineffective assistance of counsel claim requires the showing of prejudice (*Cleveland, supra,* 32 Cal.4th at p. 746) and we have found no prejudice from the admission of the statement, it follows no ineffective assistance occurred.

6. ***The Trial Court Did Not Err When It Excused A Juror Who Was Sick But Not One Who Had Limited English Skills***

Defendants assert the trial court abused its discretion when it failed to discharge a juror who indicated he lacked sufficient English-language skills to serve. Harrison separately contends the court erred when it excused a Black juror who was sick just days before the end of trial. We find no abuse of discretion.

*a.     Legal Principles*

A juror may be discharged if at any time during trial, he or she "dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty." (§ 1089.) Good cause may include "insufficient command of the English language to allow full understanding of the words employed in instructions and full participation in deliberations." (*People v. Elam* (2001) 91 Cal.App.4th 298, 316.)

"We review a trial court's decision to discharge a juror for good cause 'for abuse of discretion. [Citations.] The juror's inability to perform the functions of a juror must appear in the record as a 'demonstrable reality' and will not be presumed. [Citation.] The trial court's finding [that] 'good cause' exists will be upheld on appeal if substantial evidence supports it. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 349.)

*b.     The Limited-English Speaking Juror*

Defendants contend the trial court erred when it failed to discharge Juror No. 10, who twice expressed concerns about his English-language fluency. Defendants have forfeited this argument by not raising it in the trial court.

(1)     Proceedings Below

During voir dire, Juror No. 10 correctly answered the court's basic questions regarding his occupation, marital status, and family. When Harrison's counsel asked if he believed he could be "fair and impartial," he responded, "yes." During the prosecutor's questioning, Juror No. 10 expressed concern about his English fluency, estimating he understood "approximately" 70 percent of the prosecutor's questions and the other potential jurors' answers. He stated he was a general contractor who spoke Korean and English at work.

39

After the jury was empaneled, Juror No. 10 told the court he would have a "[h]ard time, because I have to guessing what they say and then it's hard to conversation with them." The court advised, "you don't have to speak, like, college level or with a master's in English. You just have to have a common understanding of English. And you seem to answer all the questions correctly." Juror No. 10 did not protest further and acquiesced, "Okay." Neither defense counsel asked to discharge Juror No. 10, and the court continued to the selection of alternates.

   (2) Analysis

  Defense counsels' failure to request dismissal of Juror No. 10 forfeits the issue on appeal. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212; *People v. Moreno* (2011) 192 Cal.App.4th 692, 704-705.) When Juror No. 10 initially stated he only understood 70 percent of the proceedings, defense counsel had the option to conduct further voir dire of the juror, challenge him for cause, or exercise a peremptory challenge (a defense peremptory was still available). When, after the panel had been sworn, the juror again expressed concern about his English proficiency, defendants could have requested his dismissal and replacement with an alternative juror or ask to reopen voir dire to select another juror from a full panel. Counsel did neither and may not now assert error.

  Turning briefly to the merits, the trial court was best situated to evaluate the competence of Juror No. 10 to serve. We will not second guess the court's discretionary call. (*Patton v.*

*Yount* (1984) 467 U.S. 1025, 1038; *People v. Lomax* (2010) 49 Cal.4th 530, 567.)[16]

     c.     *The Sick Juror*

Harrison alone challenges the discharge of Juror No. 1 due to illness. Because Juror No. 1 was "one of the few" Black jurors, Harrison contends the excusal violated his right to the jury to which he had consented and to a jury drawn from a representative cross-section of the community. Harrison does not dispute Juror No. 1 was sick but contends it was incumbent on the trial court to consider granting a continuance or other alternatives to excusal.

     (1)     Proceedings Below

On Monday morning, July 8, 2019, after the prosecution had rested and before the defense began its presentation, Juror No. 1 informed the trial court he had been ill since Thursday, July 4, 2019. He explained he was coughing and congested, had a sore throat, and had not slept very well. He was unable to take any medication for the symptoms due to contraindications with other medication. When Harrison's counsel asked if he would be able to stay "a couple more days" since the trial was nearly

---

[16]    We are not persuaded by *People v. Szymanski* (2003) 109 Cal.App.4th 1126, the case relied on by defendants. There, the juror spoke in broken English, her words were often unintelligible, and she asked for clarification several times. She indicated she did not understand certain terms used during voir dire, including "law enforcement" and "P.D." (*Id.* at pp. 1129–1130.) Both the prosecution and the defense requested her removal for cause. The Szymanski court reversed the defendant's convictions, finding the trial court abused its discretion when it denied the parties' request. (*Id.* at p. 1132.) Those are not our facts.

completed, Juror No. 1 responded, "if I wasn't so listless and coughing. The coughing is what really gets me, plus the sore throat." Noting that the trial was likely to finish by Friday (four days away), the court indicated it was doubtful Juror No. 1 would recover in time. The court cited that the juror was "older and, therefore, more susceptible to a stronger attack for a simple cold." Harrison's counsel agreed Juror No. 1's illness was real but objected to his removal because he was "one of the few Blacks" on the jury. Frison's counsel did not object. The court excused Juror No. 1, and an alternate was seated.

(2)     Analysis

Here, Juror No. 1's inability to perform the functions of a juror appeared in the record as a demonstrable reality — he was lethargic, coughing, and unable to take medication for his symptoms. Defense counsel did not argue the juror was malingering.

In a similar setting, the California Supreme Court explained in *People v. Landry* (2016) 2 Cal.5th 52, 89, "Whether, as [defendant] insists, a three-day continuance would have been reasonable is not the question we must answer. The question is whether, under these circumstances, the trial court's decision to proceed with an alternate juror was an abuse of discretion. In light of the uncertainty of the juror's prognosis and the crucial point at which the trial had arrived, we conclude the trial court did not abuse its discretion." The court did not immediately excuse the juror but inquired if he could stay on for a few more days. When the juror said he could not, the trial court replaced the juror. We find no abuse of discretion.

### 7. *The Trial Court Properly Denied the Jury's Request for a Dictionary*

As they made their way back to the jury room for further deliberations, a juror orally asked for a dictionary or dictionary definition. Neither was provided. Defendants contend the court prejudicially erred by not inquiring about the reason the jury wanted a dictionary or dictionary definition, particularly given Juror No. 10's professed lack of English fluency. Defendants do not contend it was error not to provide a dictionary. (See *People v. Karis* (1988) 46 Cal.3d 612, 642.)

The original request for a dictionary or dictionary definition and the court's response occurred off the record. As a result, at our request, the trial court held a hearing to settle the proceedings on the point. (Cal. Rules of Court, rule 8.137.) Instead of preparing a standalone settled statement, the court (with counsel's agreement) designated the transcript of that hearing as the settled statement.

The settled statement does not disclose the circumstances surrounding the request; neither the court nor counsel had a clear recollection of what had happened. Indeed, the court could only recall a dictionary was requested in one of two "almost back to back" murder cases. The court did not recall its response but was firm it would not have provided a dictionary and would have "probably refer[red] them back to any of the jury instructions that says all definitions are explained in the jury instructions and they are not to refer to a dictionary in their deliberations." Frison's counsel confirmed no dictionary was provided. Neither the prosecutor nor Harrison's counsel had any additional memory of the request.

43

The record does not disclose error: The court properly declined to provide the dictionary or a definition from one. (*People v. Karis*, *supra,* 46 Cal.3d 612, 642.)  Defendants' claim that the trial court failed to comply with section 1138 is off the mark.[17]  That section requires that jury questions must be given in open court in the presence of, or after notice to, the prosecution and defense.  The meager record we have does not suggest non-compliance.  Nothing in section 1138 requires the court to make further inquiry into the reason for the jury's request, and on this record we cannot find any failure to inquire was error.

**8.**     ***Cumulative Errors Do Not Require Reversal***

Defendants argue that, even if individual errors do not require reversal, their convictions should be reversed because of cumulative errors.  We have found harmless error where the trial court:  (1) admitted Frison's statement that suggested Harrison was his "crimey"; (2) failed to instruct on accomplice testimony; and (3) failed to instruct on defense of another as to Harrison.  These errors do not involve Frison and thus we reject Frison's assertion of cumulative error. (*People v. Duff* (2014) 58 Cal.4th 527, 562 ["In the absence of error, there is nothing to cumulate"].)  As to Harrison, we conclude these errors were harmless even if we were to aggregate them.

---

[17]     Section 1138 provides:  "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

### a.    *Legal Principles*

"Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice.  [Citations.]"  (*People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*).)  "Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.  [Citations.]"  (*Ibid.*)  Multiple errors related to the same issue may also create a "negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors."  (*Id.* at p. 847.)

Under the "cumulative error" doctrine, we reverse the judgment if there is a "reasonable possibility" that the jury would have reached a result more favorable to defendant absent the combination of errors.  (*People v. Rogers* (2006) 39 Cal.4th 826, 890, 911; *People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' "  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

In *Hill,* for example, the high court found reversal was required where serious and pervasive prosecutorial misconduct occurred, the trial court abdicated its judicial role to the sheriff's department to determine whether to shackle the defendant, the bailiff was allowed to continue working in the courtroom after he testified against the defendant, and the trial court erroneously instructed the jury on a special circumstance allegation.  (*Hill, supra,* 17 Cal.4th at pp. 844-848.)  The *Hill* court held the "sheer number" of errors "raise[d] the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone."  (*Id.* at p. 845.)

In *People v. Jandres* (2014) 226 Cal.App.4th 340, 356, the court held the cumulative effect of the erroneous admission of sexual assault propensity evidence and instructional error required reversal of the judgment in a case that was largely " 'a credibility contest' " between the victim and the defendant. "Because defendant' s credibility was the pivotal issue at trial, and the [sexual assault propensity evidence] tended strongly to impeach him, its erroneous admission likely weighed heavily in the jury's determination [of] whether defendant was guilty." (*Id.* at p. 360.)

   b.   *Analysis*

The harmless errors we have found in this case are not comparable to the pervasive and fundamental errors that occurred in the cases discussed above. Nor do they create a "negative synergistic effect," in part, because not all three errors relate to the same issue. Here, the failure to instruct on accomplice testimony and the admission of the "crimey" statement implicate whether there is substantial evidence to find that Harrison was one of the shooters. The failure to instruct on defense of another relates to the likelihood that the jury would have applied that defense to Harrison, even if he were a shooter.

   Considering the cumulative effect of the lack of an accomplice testimony instruction and the admission of the "crimey" statement on the issue of substantial evidence, we again observe that this was not a close case. Aside from Hunter's testimony and Frison's statement, Harrison's guilt was shown by his confession to Renee Lloyd, his report card at the Firestone and Rayo intersection, the ballistics evidence, and the video evidence.

As to the failure to instruct on defense of another, we can conceive of no rational scenario in which the jury would have applied that defense to Harrison when it rejected the same argument advanced by Frison, who, according to Harrison, was "in the exact same place as" Harrison. As was the case with Frison, there was no evidence Harrison attempted to check on Moore at any time. Despite telling Lloyd that "it was for my grandmother," Harrison never said "they got grandma" during the chase nor did he say anything about Moore at all to Lloyd. Only after the chase had ended and Moore was out of danger were shots fired.

Employing our Supreme Court's standard for the prejudice resulting from cumulative error, we conclude that the accumulation of errors did not result "in the denial of a fundamentally fair trial," nor "brought about a miscarriage of justice." (*Rogers, supra,* 39 Cal.4th at pp. 890, 911; *Hill, supra,* 17 Cal.4th at p. 844.)

9. ***The Trial Court Did Not Abuse Its Discretion in Sentencing Harrison, Nor Did Counsel Provide Ineffective of Assistance of Counsel***

Harrison alone contends his case must be remanded for a new sentencing hearing because the trial court improperly failed to consider relevant mitigating factors, particularly when it declined to strike the 25-years-to-life firearm enhancement. As part of this argument, Harrison proposes it was error for the court to sentence him without a probation report and without youth-related evidence pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*). He also faults his trial counsel for failing to submit a sentencing memorandum or presenting any factors in mitigation at sentencing. We conclude Harrison's

47

sentence was authorized by law and Harrison has failed to demonstrate he received ineffective assistance of counsel.

Separately, we conclude Harrison is not entitled to remand for a *Franklin* hearing.

a.    *Proceedings Below*

After the verdicts, Harrison's trial counsel requested time to assemble *Franklin* evidence to be used at a future youth offender parole hearing. Despite multiple continuances, no *Franklin* evidence was presented at the time of sentencing, which occurred approximately four months after the jury's verdict.

At sentencing, Harrison and his mother spoke on his behalf. They apologized to Lawson's family. Harrison's mother noted her son was only 21 at the time of the shooting, his life was just beginning, he had three small children, and he had not faced a similar situation before. She asked the court for "mercy" for Harrison.

The prosecutor asked for the maximum sentence for both defendants, arguing the callousness of the crime and the vulnerability of the victim were factors in aggravation. The prosecutor presented statements from Lawson's family. Lawson's eldest daughter accused Harrison of smirking at her "like [he] didn't care." Harrison's trial counsel explained that Harrison smiles or smirks when he is nervous and "that has no bad intent." The parties did not submit sentencing memoranda.

The trial court sentenced Harrison to a term of 50 years to life in state prison, comprised of 25 years to life for the first degree murder conviction plus 25 years to life for the firearm enhancement. The court acknowledged it had discretion to strike the firearm enhancement but found it was in the interest of justice not to do so because Harrison engaged in two separate

shootings of an unarmed man who was shot in the back.[18] Against the prosecutor's request for a seven-year consecutive term (high term) on the conviction for shooting at an occupied car, the court imposed a concurrent three-year term (low term) and found the firearm enhancement as to that count did not apply.

After the sentences were imposed, Harrison's trial counsel asked for a six-month nonappearance date for a *Franklin* hearing and, when the court indicated it had a probation report for Frison but not for Harrison, Harrison's counsel asked the court to order one. The court agreed. It set May 7, 2020, for the *Franklin* hearing and ordered a post-plea report for Harrison to be returned within a month.

b.      *Analysis of Sentencing Error Claim*

On appeal, Harrison challenges only the court's decision to impose an additional 25 years to life under section 12022.53, subdivision (d) for the personal and intentional discharge of a firearm causing great bodily injury or death. We conclude the trial court acted within its discretion

The factors a trial court must consider when determining whether to strike a firearm enhancement "are the same . . . the trial court must consider when handing down a sentence in the first instance." (*People v. Pearson* (2019) 38 Cal.App.5th 112, 117; *People v. Flores* (2021) 63 Cal.App.5th 368, 377.) In addition to the factors expressly enumerated in California Rules of Court, rule 4.428(b), the trial court is also to consider the factors listed in Rule 4.410 (listing general objectives in sentencing), as well as

---

[18]      By contrast, the trial court imposed on Frison a lesser firearm enhancement under section 12022.5, citing his demonstrated remorse and lack of prior criminal contacts.

circumstances in aggravation and mitigation under Rules 4.421 and 4.423.[19]  (*Pearson, supra,* at p. 117.)  "Relevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise."  (Rule 4.409.)

Nothing in the record affirmatively establishes the trial court did not take into account all the relevant factors it was required to consider when it sentenced Harrison.  (Rule 4.409.)  The record shows the trial court understood it had discretion to strike the firearm enhancement but declined to do so, citing to the circumstances of the crime as factors in aggravation.  From its comments at the sentencing hearing, it is apparent the court was persuaded "[t]he crime involved great violence . . . or other acts disclosing a high degree of cruelty, viciousness, or callousness," that the "defendant was armed with or used a weapon at the time of the commission of the crime," and that the "victim was particularly vulnerable."  (Rule 4.421(a)(1)-(3).)

The record also shows the trial court was aware it could rely on mitigating circumstances in connection with its sentencing discretion, as it cited to Frison's remorse and lack of previous criminal contacts when it imposed a lesser included firearm enhancement as to Frison.  Harrison's mother also brought to light several mitigating factors, including that Harrison was just 21 years old at the time of the shooting, had three children and had "not been in any type of situation of this

---

[19]  All further rule references are to the California Rules of Court.

50

nature either."[20]  On this record, the trial understood its discretion and did not abuse it in declining to strike the firearm enhancement.

We reject Harrison's separate contention the trial court abused its discretion to sentence him without a probation report. As an initial matter, Harrison did not object to the lack of a probation report prior to sentencing and thus has failed to preserve this issue on appeal. (*People v. Goldstein* (1990) 223 Cal.App.3d 465, 472; *People v. Llamas* (1998) 67 Cal.App.4th 35, 38-39.)  In any event, Harrison has failed to demonstrate the omission, if it was erroneous, was prejudicial; he does not identify what information a probation report would have provided that was not already available to the trial court (e.g., his youth) and that would have been reasonably likely to persuade the trial court to impose a more favorable sentence. (*People v. Dobbins* (2005) 127 Cal.App.4th 176, 182 [review of failure to obtain probation report governed by *Watson* harmless error standard].)

c.      *Analysis of Ineffective Assistance of Counsel Claim*

On this record, we reject Harrison's claim that he received ineffective assistance of counsel at sentencing. *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301 (*Sepulveda*) presents substantially identical facts and persuasive authority. There, the trial court had discretion to strike two 25-year-to-life firearm enhancements. (*Id.* at pp. 301–302.)  The trial court declined to do so and ordered both enhancements to run consecutively, increasing the defendant's sentence from 40 years to life to 90

---

[20]     It is unclear whether his mother meant he had no prior criminal record.  The information did not charge Harrison with any prior strikes and no probation report had been prepared at the time of sentencing.

years to life. As here, the sentencing hearing had previously been delayed for more than a year in order for counsel to assemble the relevant *Franklin* information. Yet, no significant mitigating information was presented at the sentencing hearing. Nor did counsel request another continuance of the sentencing hearing. (*Ibid.*) Instead, trial counsel stipulated to submit the *Franklin* information after sentencing, in written form, and without live testimony, cross-examination, or the defendant's presence. (*Id.* at p. 300.)

The *Sepulveda* court rejected the defendant's ineffective assistance of counsel argument, reasoning the claim was more appropriately made in a petition for habeas corpus because the record on direct appeal did not explain why counsel "chose to proceed in this fashion." (*Sepulveda, supra,* 47 Cal.App.5th at p. 302.) Because the record was silent, it fell to the defendant to show counsel lacked any rational tactical purpose for his decisions. The court found it "at least plausible" that defense counsel recognized "the eventual youth offender parole hearing would occur during his 25th year of incarceration whether his aggregate indeterminate sentence was 40 years to life or 90 years to life, and believed under those circumstances [the defendant] would benefit more by an agreement with the prosecution to have the *Franklin* memorandum presented without contemporaneous challenge or contradiction than by introducing that material at the sentencing hearing in the remote chance the trial court would exercise its discretion to strike the firearm enhancements." (*Ibid.*)

Harrison advances the same ineffective assistance of counsel argument as the defendant in *Sepulveda* did. It fails for the same reasons. Here the record is silent as to why trial

counsel failed to ask for leniency or present any mitigating factors, including *Franklin* documents. Harrison concludes counsel could have had "no rational tactical purpose" for these decisions. That misses the point – the record is silent on what additional mitigating evidence there might have been. This makes it impossible for us to find any ineffective assistance of counsel prejudiced Harrison.

> d. *Analysis of* Franklin *Hearing Claim*

Harrison relies on *Franklin* to argue (1) fundamental due process requires *Franklin* documents be provided at the sentencing hearing and (2) remand is necessary to hold an overdue *Franklin* hearing. We reject both arguments.

At the time of the shooting, Harrison was just a few months shy of his 22nd birthday. As such, he will be entitled to a youth offender parole hearing in his 25th year of incarceration, despite his sentence of 50 years to life. (See § 3051, subd. (b)(3); *In re Cook* (2019) 7 Cal.5th 439, 449.) Sections 3051 and 4801 " 'establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release' upon a showing of maturation and rehabilitation." (*In re Cook, supra*, 7 Cal.5th at p. 449; § 4801, subd. (c).)

A youth offender is entitled to "place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. The goal of any such proceeding is to provide an opportunity for the parties to make an

accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the [Parole] Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he [or she] was a child in the eyes of the law.' " (*Franklin, supra*, 63 Cal.4th at p. 284.) Under *Franklin*, preservation of this information "is typically a task more easily done at or near the time of the juvenile's offense" not decades later. (*Ibid.*)

We reject Harrison's contention that *Franklin* documents must be submitted prior to sentencing. In *Sepulveda, supra,* 47 Cal.App.5th at page 301, the court explained, "The purpose of providing an opportunity to present youth-related factors mitigating culpability is not to influence the trial court's discretionary sentencing decisions but to preserve information relevant to the defendant's eventual youth offender parole hearing." (*Id.* at p. 300.) The appellate court held that *Franklin* information was not required to be submitted before or at sentencing and its submission afterwards did not violate the defendant's constitutional rights. (*Id.* at pp. 300–301.)

On this record, we also reject Harrison's second claim – that remand is necessary for an overdue *Franklin* hearing; in his reply brief, Harrison asserts no *Franklin* documents have been submitted. The record shows the court provided Harrison with adequate opportunity to make a record of mitigating youth-related evidence. Yet, his trial counsel failed to do so. To the extent Harrison contends he received ineffective assistance of counsel, the matter is more appropriately addressed in a habeas

corpus proceeding. (*People v. Henderson* (2022) 78 Cal.App.5th 530, 567; *Sepulveda, supra,* 47 Cal.App.5th at p. 302.)

As a final observation, the Supreme Court has held that a juvenile offender whose conviction and sentence are final may file a motion under section 1203.01 for the purpose of making a record of mitigating youth-related evidence under *Franklin*. (*In re Cook*, *supra,* 7 Cal.5th at pp. 446–447.) Harrison may yet file such a motion when his conviction and sentence are final.

## ***DISPOSITION***

The judgment is affirmed.

RUBIN, P. J.

I CONCUR:

KIM, J.

The People v. Davion Harrison et al.
B302288, B303783


BAKER, J., Concurring


I agree the criminal judgments should be affirmed. My agreement with the majority's reasons for affirming as to defendant and appellant Enoch Frison (defendant Frison) is without reservation. As to defendant and appellant Davion Harrison (defendant Harrison), however, more needs to be said.

The police investigators in this case set up *Perkins* operations against defendants in the hope of obtaining recorded incriminating statements that could be used against them at trial. The tactic succeeded spectacularly against defendant Frison: he made many statements incriminating himself in the murder of victim Anthony Lawson.[1] The undercover law enforcement officer then went further and elicited yet another incriminating statement—but not a statement incriminating defendant Frison himself. (There was no need at that point because defendant Frison had already thoroughly done that.) Instead, at the very end of their recorded interaction, the officer prompted defendant Frison to incriminate defendant Harrison by asking defendant Frison who his "crimeys" or crime partners were. Defendant Frison identified "Davion" (defendant Harrison's first name).

---

[1] As the majority's opinion explains, the tactic was much less successful when employed against defendant Harrison.

The majority merely assumes that permitting the jury to hear defendant Frison's unimpeachable recorded statement incriminating defendant Harrison was error. There is no need for assumptions, however. Under the circumstances, defendant Frison's identification of another "crimey" or crime partner involved in the killing could have only served to minimize or mitigate defendant Frison's role, and it certainly was not a statement that did anything to further disserve defendant Frison's penal interest. (Evid. Code, § 1230; *People v. Grimes* (2016) 1 Cal.5th 698, 714-715 [statements must be parsed out individually and examined in context to see "'whether as a matter of common sense the portion at issue was against interest'"]; see also *People v. Lawley* (2002) 27 Cal.4th 102, 154, 155, fn. 21.) In my view, we should not shy away from calling this error an error, lest trial courts come away with the impression that admitting this particular sort of evidence procured in a *Perkins* operation involving one defendant for use against a co-defendant is fair game in a criminal trial.

I agree, however, with the majority that the error was harmless, when considered individually or cumulatively, on this record (in light of, among other things, the video footage admitted in evidence that shows a man identified as defendant Harrison firing a gun outside the 7-Eleven). I therefore concur in affirming the criminal judgments against both defendants.


BAKER, J.


2